MATSUSHITA ELECTRIC CORPORA-
TION OF AMERICA, a
corporation, Plaintiff,

v.

S. S. AEGIS SPIRIT, her engines, etc.,
et al., Defendants.

The SUMITOMO MARINE & FIRE
INSURANCE COMPANY, Plaintiff,

v.

S. S. AEGIS SPIRIT, her engines, tackle,
furniture, apparel, and equipment, etc.,

and

Estrella Dischosa Navigation, S.
A., Defendants.

Nos. 88–73C3, C74–152S.

United States District Court,
W. D., Washington.

April 30, 1976.

Theodore A. Le Gros, Howard, Le Gros, Buchanan & Paul, Seattle, Wash., for defendant Estrella.

Edward C. Biele, Bogle & Gates, Seattle, Wash., for Tokai Shipping.

## OPINION

BEEKS, District Judge.

### FACTS

These consolidated cases mark the latest skirmish in the age old war between shippers and carriers over their respective rights and liabilities. The case instituted by Matsushita Electric Corporation ("Matsushita") against the S.S. AEGIS SPIRIT ("Vessel"), Tokai Shipping Company ("Tokai") and Estrella Dischosa Navigation ("Estrella")—the latter defendants being respectively the time charterer and owner of Vessel—concerns damage to cargo transported in containers owned by Tokai.[1] The companion case instituted by Sumitomo Marine & Fire Insurance Company, Ltd. ("Sumitomo"), as subrogee[2], against Vessel and Estrella concerns damage to the containers. The respective liabilities of the defendants in both causes have been heretofore established by interlocutory judgment rendered by this Court on July 18, 1974, which left for future decision only the measure of damages with attendant issues of fact and law. In *Matsushita* a further bifurcation of the damage question has been effected whereby the Court will limit its consideration to the difficult legal question herein posed—more specifically, the interpretation and rationalization of the liability limiting provisions of the Carriage of Goods By Sea Act[3] ("COGSA") as applied to cargo shipped in metal containers supplied by the carrier.

Matsushita was the consignee of an assorted shipment of color televisions, stereo-

Dwight L. Guy, Detels, Draper & Marinkovich, Seattle, Wash., for plaintiffs.

1. A third original defendant, Aegis Shipping Company, has been released from this action by the Court upon stipulation of all parties at trial.

2. Sumitomo. as Tokai's insurer, has compensated Tokai for damage sustained to the con-

tainers and is now subrogated to Tokai's rights over against Estrella.

3. 46 U.S.C. § 1300 *et seq.*

phonic equipment and other electrical appliances which were shipped in containers on board the Vessel from Japan to the United States by Matsushita's Japanese counterpart corporation, Matsushita Electric Trading Company of Japan ("Matsushita/Japan").[4] This shipment arrived at Tacoma, Washington, on or about May 2, 1973, with the contents of eleven (11) containers in a much deteriorated condition, apparently due to concussive forces and the entry of sea water into the containers during the voyage. The containers themselves also sustained material damage en route. Matsushita's claim against Tokai and Estrella with respect to its consigned goods is clearly embraced by COGSA, but the applicability of COGSA to Sumitomo's consolidated claim for container damage is an issue for determination.

Before turning to the legal questions presented, their factual context must first be fully brought to light. The contract for carriage was negotiated in Japan between representatives of Tokai and Matsushita/Japan. Estrella did not participate in these negotiations, nor did the master or any other Estrella representative endorse the bills of lading. As a product of these negotiations Tokai issued to Matsushita/Japan, in addition to its bills of lading, a so-called "letter of guaranty"[5] which stated:

Shipment of Electrical goods in Containers

We hereby declared and agreed that your shipment of electrical goods in containers whenever accepted and transported by us, we will undertake our liability to the extent of $500 per package contained in containers in case of loss or damage to goods but subject to the production of the relevant invoice and terms and conditions of bill of lading issued by us.

It would be further noted that other terms and conditions of bill of lading remain inaltered. [sic.]

The terms and descriptions on the face of each of the bills of lading issued by Tokai in connection with the damaged cargo can best be considered by reproducing relevant portions of one of them[6] which is fairly representative of all.[7] The physical orientation of the terms below has, however, been altered for convenience in tabulation.

| Container No. and Seal No.: | SSIU211586–7 SSIU201108 |
|---|---|
| Marks and Nos.: | Tokai 00653 Tokai 06686 |
| No. of Containers or Pkgs.: | 2 containers |

Kind of Packages; Description of Goods:

"SHIPPER'S LOAD COUNT AND SEAL"

Said to contain:

| CT301 | (120 c/t) | Color TV |
|---|---|---|
| CT911 | (120 " ) | " |
| CT772 | (100 " ) | " |
| CT201 | (220 " ) | " |
| CT398 | ( 21 " ) | " |
| CT911 | ( 20 " ) | " |

(601 cartons)

| Gross Weight: | 27,722 lbs. |
|---|---|
| Measurement: | 3,619′–3″ |

TOTAL NUMBER OF CONTAINERS OR PACKAGES (in words)—
Say: Two (2) Containers only

| Rate Per: | at US $1,500.-/one container (F. A. K.) |
|---|---|
| Collect: | US $3,000 |

The reverse side of each Tokai bill of lading contains these pertinent provisions:

1. (Definition) The following words on the face and back hereof have the meanings hereby assigned:

(a) "Carrier" means Tokai Shipping Co., Ltd. and the Vessel and/or her owner;

---

4. From the record it appears that these electrical goods were manufactured by Matsushita Electrical Industrial Company of Japan who sold them to Matsushita Electric Trading Company of Japan for distribution. No distinction between these Japanese corporations need be made for present purposes and the shorthand notation "Matsushita/Japan" will be used herein to refer to either or both indiscriminately.

5. Exhibit 22.

6. Exhibit A–1 and 1(A).

7. Exhibit A–1. One of the eleven bills of lading in this exhibit does not include all of the information that the others do on its literal face, but, when taken together with the page annexed to it, is substantially identical in content.

(b) "Merchant" includes the shipper, consignor, consignee, owner and receiver of the Goods and the holder of this Bill of Lading;

(c) "Goods" mean the cargo described on the face of this Bill of Lading and, if the cargo is packed into container(s) supplied or furnished by or on behalf of the Merchant, include the container(s) as well;

.  .  .  .  .

26. (Limitation of Liability) .  .  ..
In case the declared value is markedly higher than the actual value, the Carrier shall in no event be liable to pay any compensation, and (ii) where the cargo has been either packed into container(s) or unitized into similar article(s) of transport by or on behalf of the Merchant, it is expressly agreed that the number of such container(s) or similar article(s) of transport shown on the face hereof shall be considered as the number of the package(s) or unit(s) for the purpose of the application of the limitation of liability provided for herein.[8]

Tokai's status as a COGSA "carrier" in these cases is, of course, beyond doubt.[9] The bill of lading defines "carrier" to include Estrella,[10] and Estrella conceded at trial, as did all parties, that it was indeed a carrier herein.

Provisions of special interest found in the Tokai Line Tariff which was on file with the Federal Maritime Commission at the time of the subject voyage include: [11]

RULE NO. 16 Limit of Carrier's Liability
The liability of the carrier as to the value of shipments at the rates herein provided shall be determined in accordance with the clauses of the carrier's regular Bill of Lading form. If the shippers desire to be covered for valuation in excess of that allowed by the carrier's regular Bill of Lading covering such shipments and such

additional liability only will assumed [sic.] to be the carrier's at the request of the Shipper and upon payment of an additional charge of 4% of the total declared valuation in addition to the stipulated rate on the commodities shipped as specified herein.

.  .  .  .  .

108. SHIPPER'S LOAD AND COUNT.
(a) Shippers to furnish carrier, at the time of delivery a packed and sealed container, a list of contents in the container showing description of goods and the gross weight and measurements of the contents thereof, and carrier will accept same as "Shipper's Load and Count" and Bill of Lading to be so claused.

.  .  .  .  .

(d) Containers will be classed as a single unit for which only one Bill of Lading may be issued. Vessel's liability will be limited accordingly as per terms and conditions of Carrier's Bill of Lading.

The Matsushita electrical goods, having first been packaged for export, were physically packed into the Tokai containers by Matsushita/Japan employees or agents at its own place of business, or, in some cases, at warehouse sites designated by Matsushita/Japan. The containers had earlier been entrusted to Matsushita/Japan to facilitate the stuffing operation unaccompanied by Tokai representatives. For this reason, Tokai was entirely bereft of firsthand knowledge as to the quality and quantity of goods packed in its containers.

There is no dispute concerning the nature of the packaging used by Matsushita/Japan. The various kinds of electrical merchandise were first wrapped in plastic bags, then fitted with styrofoam padding, and finally packed into heavy, double-walled cardboard cartons which were marked to indicate the type of goods and the manufac-

8. The "limitation of liability provided herein" refers to the earlier incorporation in paragraph 26 of the essential provisions of 46 U.S.C. § 1304(5).

9. See 46 U.S.C. § 1301(a).

10. Paragraph 1(A), supra in text.

11. Exhibit A-3 at p. 8A, 66.

turer thereof.[12] Matsushita/Japan utilizes lighter, less durable packaging materials for its domestic market.[13] Although the greater portion of its export shipments are containerized, Matsushita/Japan continues to export a small percentage of its electrical wares break bulk,[14] packaged in a manner identical to that described above.[15] Furthermore, the consistent testimony of numerous witnesses establishes the fact that Matsushita/Japan and other shippers of like goods have traditionally employed packaging materials for the shipment of electrical goods of a strength and quality comparable to the above in their break bulk transoceanic shipments.[16] Finally, the extent of the damage to Matsushita's goods is stipulated to be in excess of $500 per each of the containers.

## DAMAGE TO CONTAINERS

The Vessel was time-chartered by Tokai from Estrella utilizing a New York Produce Exchange approved Government form supplemented and, in some instances, modified by typed-in terms and conditions.[17] The charter party is silent as to the rights and duties of the parties respecting the containers which were owned and provided for shipper's use by Tokai. Aggregate container damages are stipulated in the amount of $21,749.75.[18]

Estrella's liability with respect to the containers having been previously adjudicated, there remains in dispute only the availability to Estrella of the COGSA package limitation embodied in 46 U.S.C. § 1304(5) which states:

*Amount of liability; valuation of cargo*

(5) Neither the carrier nor the ship shall in any event be or become liable for any loss or damage to or in connection with the transportation of goods in an amount exceeding $500 per package lawful money of the United States, or in case of goods not shipped in packages, per customary freight unit, or the equivalent of that sum in other currency, unless the nature and value of such goods have been declared by the shipper before shipment and inserted in the bill of lading. This declaration, if embodied in the bill of lading, shall be prima facie evidence, but shall not be conclusive on the carrier. By agreement between the carrier, master, or agent of the carrier, and the shipper another maximum amount than that mentioned in this paragraph may be fixed: *Provided,* That such maximum shall not be less than the figure above named. In no event shall the carrier be liable for more than the amount of damage actually sustained.

Neither the carrier nor the ship shall be responsible in any event for loss or damage to or in connection with the transportation of the goods if the nature or value thereof has been knowingly and fraudulently misstated by the shipper in the bill of lading.

Before Estrella can invoke the COGSA limitation, however, it must first establish the eligibility of this container damage claim for COGSA treatment. Estrella has failed to so do. The Sumitomo claim falls outside the scope of COGSA.

12. Testimony of B. Michael Probert, Edward Van Bemmel and J. K. Dominguez. Depositions of Takezo Yonetani at 13; Hiroshi Matsuno at 5; Hameichi Inura at 8; and Isao Inoue at 11.

13. Depositions of Hameichi Inura at 8; Koichi Nakagawa at 4; Masauki Naki at 4; Takezo Yonetani at 12–13. Only with respect to tape recorders was there testimony that Matsushita/Japan does not differentiate in packaging between foreign and domestic shipments, and there the testimony was that heavy export packaging was used for both. Deposition of Hiroshi Matsuno at 5.

14. "Break bulk" refers to traditional, non-containerized cargo carriage.

15. Deposition of Koichi Nakagawa at 4–5.

16. Testimony of Edward Van Bemmel, J. K. Dominguez, B. Michael Probert, Ernest Erker and Melville Voge. Depositions of Isao Inoue at 8; Koji Urata at 6; Kaoji Adachi at 5.

17. Exhibit A–2.

18. Pretrial Order at p. 4.

COGSA is expressly limited in its coverage to contracts for carriage of goods by sea to or from ports of the United States which contracts are evidenced by a "bill of lading or similar document of title." [19] This language plainly excludes the relationship between Tokai and Estrella with respect to these containers, because, first, the containers themselves were in nowise represented collectively or individually by "documents of title." Title to the damaged containers remained in Tokai throughout the time period relevant to this case unaffected by the issuance and negotiation of the bills of lading covering the container contents. Second, there was no "contract for carriage" between Tokai and Estrella respecting the containers and, they cannot rationally be considered shipped goods. They were not cargo; they were, rather, carrier-owned equipment designed to provide additional protection for cargo while facilitating the handling, loading, stowing and discharge of same. COGSA is an act of limited scope intended only to govern important aspects of the relationship between the issuer and holder of a bill of lading (or similar document of title),[20] not the contractual relationship between a carrier/time charterer and the vessel owner. As between Estrella and Tokai the container arrangement was no more nor less than a simple contract of bailment. Consequently, Estrella is foreclosed from reducing Sumitomo's subrogated claim by resort to the limitation provisions of COGSA.

19. 46 U.S.C. § 1300.

20. G. GILMORE & C. BLACK, THE LAW OF ADMIRALTY 145 (2d ed. 1975). Nor is Estrella assisted in its appeal to the liability limiting provisions of COGSA by the definition of "goods" set forth in the bills of lading at paragraph 1(c) and quoted in the text *supra*. The quoted definition does not serve to qualify these bills of lading as documents of title within the meaning of 46 U.S.C. § 1300—"the containers" still belong to Tokai; second, the bills of lading containing said language do not purport in any way to regulate relations between Tokai and Estrella; and, finally, this clause is most sensibly construed to refer only to those containers which are *not* "supplied or fur-

## DAMAGE TO THE GOODS

### I. Background

Because of the importance of the issue presented to those governed by COGSA, a few brief observations about containerized transport in general are appropriate. The cargo shipped on the voyage at issue was packed into large, reusable metal containers [21] which were in turn loaded on the Vessel and secured for carriage. The emergent use of these cargo-carrying containers marks a significant technological stride within the maritime industry, and their use seems certain to expand in years to come because of the substantial advantages they provide over conventional modes of ocean carriage for shippers and carriers alike. Their increasing popularity finds its source in the enhanced economy and efficiency they offer in the handling, loading, stowing and discharge of most types of seagoing cargo.[22] Their value to shippers lies in the greater protection they afford cargo from pilferage, rough handling and the elements. Use of containers will frequently permit the shipper to substitute lighter, more economical packaging materials without increased risk to the cargo. Furthermore, the shipper can, in most container operations, personally insure a tight stow and the careful handling of his goods, because he has the responsibility to stuff the containers under the carriage contract.[23] The carrier, for its part, enjoys tremendous savings in labor by eliminating slow, manual handling and stowing of individual packages and in claim payments by reason of reduced cargo loss and damage.[24]

nished by or on behalf of" the *carrier,* and thus has no application in the instant case.

21. The dimensions of the eleven containers at issue are 40' x 8' x 8' which is a standard size in the industry. *See* Simon, The Law of Shipping Containers, 5 J. of Mar. L. and Comm. 507, 510 (1974); Exhibit A–3 at paragraph 100.

22. *See* Simon, *supra* note 21.

23. *Id.* at 512.

24. Indeed, there is every reason to believe that carriers realize greater economic benefits from the container operation than do shippers. *See Royal Type. Co., Div. of Litton Bus. Sys., Inc. v. M/V KULMERLAND,* 483 F.2d 645, 647 n. 3

Although shippers and freight forwarders sometimes acquire their own fleets of containers, carriers are the predominant owners of containers used in maritime commerce.[25]

## II. Prior Case Law

The Court of Appeals to which I am accountable has yet to speak to the question of when, if ever, a container is to be considered a "package". In contrast, the Second Circuit has had occasion to pass on this question in a series of recent cases and, in the process, has become a chief source of guidance in this most troublesome area. Unfortunately, however, the decisions of the Second Circuit expounding the impact of the package limitations statute on containerized shipments have not been altogether congruous in approach and result notwithstanding periodic attempts by that court to harmonize them.[26]

On the one hand, two comparatively recent Second Circuit decisions written by then Chief Judge Friendly, *Leather's Best, Inc. v. S.S. MORMACLYNX* (1971)[27] and *Shinko Boeki Co., Ltd. v. S.S. PIONEER MOON* (1974),[28] strongly suggest that a carrier-owned container ought never to be considered a "package" consistent with the spirit and language of COGSA's liability limiting provisions.[29] These cases emphasize that the nature and use of these containers is such that they are "functionally part of the ship", and that Article 4(5) of COGSA (46 U.S.C. § 1304(5)) refers, rather,

to the shipper's own packaging which is an integral part of his shipment.

A markedly different view is espoused in two other Second Circuit decisions including that circuit's most recent pronouncement in *Cameco, Inc. v. S.S. AMERICAN LEGION* (1974).[30] In both *Cameco* and its forerunner in rationale, *Royal Typewriter Co., Division of Litton Bus. Sys., Inc. v. M/V KULMERLAND* (1973),[31] the Second Circuit in opinions by Judge Oakes instituted and applied a "functional economics" test which deemed the shipper's own carton or crate, rather than the container, a presumptive "COGSA package" if the carton or crate incorporates packaging sturdy enough to withstand the rigors of break bulk carriage.[32] If the shipper's package meets this test, it is deemed to be what the Court called a "functional package." If, however, the Court finds the cargo, as packaged by the shipper, unsuited to break bulk carriage, a contrary presumption obtains—that is, the container itself becomes the presumptive COGSA package. In either case the presumption can be rebutted by evidence of an intention by the contracting parties to treat as a COGSA package something other than the presumptive package.[33] Therefore, *Cameco* and *Royal Typewriter* taken together propound a completely "neutral" formula—from a judicial standpoint—for determining whether and when a ship's container is a COGSA package. Furthermore, under the *Cameco/Royal Typewriter* analysis, the intent of the parties is made the ultimate determinant in identifying the

(2nd Cir. 1973); *Leather's Best, Inc. v. S. S. MORMACLYNX,* 451 F.2d 800, 815–16 n. 19 (2d Cir. 1971); Simon, *supra* note 21, at 512–13, 521; Simon, More on the Law of Shipping Containers, 6 J. of Mar. L. and Comm. 603, 608 (1975).

25. Simon, *supra* note 21, at 513.

26. *See Cameco, Inc. v. S.S. AMERICAN LE-GION,* 514 F.2d 1291, 1298 (2d Cir. 1974); *Shinko Boeki Co., Ltd. v. S.S. PIONEER MOON,* 507 F.2d 342, 345–46 (2nd Cir. 1974); *Royal Typewriter Co., Div. of Litton Bus. Sys., Inc. v. M/V KULMERLAND,* 483 F.2d 645, 649 (2nd Cir. 1973).

27. 451 F.2d 800 (2d Cir. 1971).

28. 507 F.2d 342 (2d Cir. 1974). Although *Shinko Boeki* involved bulk goods shipped in carrier's containers, its treatment of the container/package question is no less applicable to packaged goods.

29. 507 F.2d 342, 345–46 (2d Cir. 1974) and 451 F.2d 800, 815–16 (2d Cir. 1971).

30. 514 F.2d 1291 (2d Cir. 1974).

31. 483 F.2d 645 (2d Cir. 1973).

32. 514 F.2d 1291, 1298–99 (2d Cir. 1974) and 483 F.2d 645, 648–49 (2d Cir. 1973).

33. *Id.*

COGSA package. These characteristics of the *Cameco/Royal Typewriter* test are not easily reconciled with the earlier-described approach of *Leather's Best* and *Shinko Boeki* which, at least tacitly, appear to set up a blind presumption *against* the carrier's containers being COGSA packages and, significantly, make no mention of the parties' intent as having a bearing on the COGSA package issue.[34]

One might well conclude that the Second Circuit is still in the process of refining an appropriate legal standard to resolve the limitation question. Nevertheless, the labors of the Second Circuit are most instructive, albeit inconclusive, in highlighting the practical and conceptual problems involved.

### III. Analysis

Although this case poses a COGSA interpretive question of first impression in the Ninth Circuit, there are some relevant and illuminating remarks in *Hartford Fire Insurance Co. v. Pacific Far East Lines, Inc.* (1974).[35] The specific holding in *Hartford* was that a 36,700 pound free-standing electrical transformer which was shipped uncrated, but attached to wooden skids, did not constitute a package within the meaning of COGSA's $500 per package liability limitation.[36] While this ruling does not itself advance the analysis herein, the opinion goes on to enunciate certain principles and insights that do provide logical guidance toward resolution.

The *Hartford* Court began its analysis by examining the history and origins of COGSA as well as the ends to which it was addressed. The Court recognized that COGSA was intended to afford greater protection to cargo interests and specifically observed that, under COGSA, "the carriers were to accept greater liability for damages per package without a corresponding increase in freight rates." [37] Concerning the package limitation itself, the Court made this observation:

> It was not the purpose of the act, therefore, to relieve the carrier of its normal responsibility for damage to cargo or to unduly limit its liability for just claims . . . . .[38]

Significantly, the *Hartford* opinion cites with approval *Leather's Best* as authority for the proposition that ". . . industry advancements do not justify any overextension of the statutory term 'package.' " [39] *Hartford's* final contribution to the task at hand lies in its treatment of the COGSA term "package". After some preliminary discussion the *Hartford* Court concluded that:

> [s]ince no specialized or technical meaning was ascribed to the word "package," we must assume that Congress had none in mind and intended that this word be given its plain, ordinary meaning.[40]

The declarations excerpted from *Hartford* are well-founded and, when applied to the facts of the case at bar, help to expedite analysis.

■ To be satisfactory, a test for determining whether a container is a package must reflect the realities of the maritime industry of today while remaining faithful to the express language and legislative policy embodied in the pertinent COGSA provi-

---

**34.** In *Shinko Boeki,* 507 F.2d at 346 there is this remark: "In line with that thought, we have endeavored, doubtless without complete success, to apply the statute in accord with the probable expectations of the parties." This statement is a postscript to the Court's holding and appears to have played no significant role in the thorough analysis leading to the decision. In any event, "probable expectations" is a different concept from "intent" as one's expectations can often, and unhappily, part company with one's intentions.

**35.** 491 F.2d 960 (9th Cir. 1974).

**36.** 46 U.S.C. § 1304(5) set out in the text, *supra.*

**37.** 491 F.2d 960, 962 (9th Cir. 1974).

**38.** *Id.* Although the quoted language had immediate reference to *unpackaged* goods, that being the focus of the case, the context and overall chain of reasoning plainly demonstrate its applicability to packaged goods as well.

**39.** 491 F.2d 960, 963 (9th Cir. 1974).

**40.** *Id.*

**904**

sions.[41] Regarding the latter objective, this Court's function is not to create *ex nihilo* a fair and equitable rule for allocating risks with respect to containerized cargo; but, rather, to fairly and sensibly interpret the existing legislation. This task is often, as here, not easy; but it must be emphasized that such difficulty does not warrant a judicial usurpation of the Congressional prerogative in a well-intentioned effort to remedy obsolete or ill-conceived legislation.

The "functional economics" test announced by the Second Circuit in *Royal Typewriter* and reaffirmed in *Cameco* is an unsatisfactory guide to decision-making under both of the above criteria. First, the creation at the outset of a presumption for or against the container being a COGSA package depending on whether the shipper has used a "functional package" conforms neither to the sense of 46 U.S.C. § 1304(5) nor the practical economies of containerized shipping. The plain language of that section distinguishes only between goods shipped in packages and goods not shipped in packages. There can be found no indication in COGSA or its legislative history that goods shipped in cartons, crates or other receptacles were to be disqualified from packaged goods treatment whenever the shipper's packaging fell below some later-to-be-established standard of strength and durability. Furthermore, tying such a standard to hypothetical break bulk carriage conditions compels courts to make conjectural determinations and require production of evidence of a kind never even remotely

contemplated—from what I can gather—by the framers of COGSA. Added to this is the fact that the test effectively penalizes shippers when they avail themselves of more economical packaging made possible through containerization, because they then face the prospect of bearing significantly increased risks and liabilities due to the container being deemed a presumptive COGSA package. On the other hand, as discussed previously, the carrier enjoys corresponding benefits from containerized cargo carriage which are entirely neglected in the "functional economics" test. Only the shipper's pecuniary advantage is seized upon and, in effect, neutralized by this test. It clearly appears that the *Cameco/Royal Typewriter* presumption violates the salutary rule that courts should, whenever possible, foster good commercial practices and, accordingly, refrain from creating disincentives to mercantile economization.[42]

Second, the "functional economics" test suffers from a more serious flaw: it makes the intent of the parties, as revealed by the available evidence, the touchstone in applying the COGSA liability to a containerized shipment. This is true because evidence of intent will serve to rebut the initial presumption and identify conclusively, it would appear, the COGSA package. The better and more traditional approach, which I adopt, is to conscientiously construe the legislation in the factual context seeking to effectuate the *legislative,* not the parties', intent and purpose. The undoubted objective of 46 U.S.C. § 1304(5)

**41.** Another pertinent COGSA section, in addition to 46 U.S.C. § 1304(5), is 46 U.S.C. § 1303(8):

(8) Any clause, covenant, or agreement in a contract of carriage relieving the carrier or the ship from liability for loss or damage to or in connection with the goods, arising from negligence, fault, or failure in the duties and obligations provided in this section, or lessening such liability otherwise than as provided in this chapter, shall be null and void and of no effect. A benefit or insurance in favor of the carrier, or similar clause, shall be deemed to be a clause relieving the carrier from liability.

**42.** *See, e. g., Gulf Italia Co. v. American Export Lines, Inc.,* 263 F.2d 135, 137 (2d Cir. 1959);

Simon, *supra* note 21, at 523; DeOrchis, The Container and the Package Limitation—The Search for Predictability, 5 J. of Mar. L. and Comm. 251, 257 (1974). The Second Circuit's attempt to blunt this criticism with speculation about a possible need to repackage containerized cargo with stronger materials for post-voyage distribution in *Cameco,* 514 F.2d at 1299, seems somewhat fanciful. In any event, there is no reason to believe that the repackaging procedure envisioned by the Second Circuit is customary or a practice in general use. *See* Simon, More on the Law of Shipping Containers, 6 J. of Mar. L. and Comm. 603, 611, 614 (1975).

was to establish a minimum floor below which carriers subject to the act could not reduce their liability for cargo damage.[43] If carriers alone, or even carriers and shippers together, are allowed to christen something a "package" which distorts or belies the plain meaning of this word as used in the statute, then the liability floor becomes illusory and negotiable. The package limitation provision serves no purpose whatsoever if the courts' function in applying it is to merely identify and uphold the parties' private definition of COGSA package. Of course, the parties' characterization may often be wholly reasonable and consistent with the language and purpose of the statute, but the point to be made is that it is not the parties' characterization of the shipment, but the court's interpretation of the statute, that controls.[44]

■■■■ A further undesirable side effect of a rule based upon the parties' intentions is its obvious potential for impairing the value and negotiability of ocean bills of lading, due to uncertainty in the allocation of risks with respect to the cargo.[45] The

holder of the bill can never be sure what the shipper and carrier "intended" to treat as a package, except to the extent that said intent can be deduced from the four corners of the bill itself. Bills of lading, though, are hardly appropriate vehicles for such expressions of mutual intent, because their contractual terms are commonly the product of unilateral draftsmanship by the carrier incorporating largely self-serving provisions.[46]

■■■ The intractable nature of the "functional economics" test is made manifest in the case at bar. Matsushita/Japan and Tokai could not have more clearly expressed their mutual intent regarding the identity of the COGSA package. Their understanding was formally recited in the "letter of guaranty" issued by Tokai at the request of Matsushita/Japan. This honest attempt by these parties to clearly define the COGSA package for this particular shipment, while seemingly in keeping with the spirit of *Cameco/Royal Typewriter* approach, very likely violates the Shipping Act of 1916[47] as constituting an illegal and invalid "preference."[48] Furthermore, if

---

**43.** 46 U.S.C. § 1303(8). *See, e. g., Hartford Fire Insurance Co. v. Pacific Far East Lines, Inc.,* 491 F.2d 960, 962 (9th Cir. 1974); *Shinko Boeki Co., Ltd. v. S.S. PIONEER MOON,* 507 F.2d 342, 344–45 (2d Cir. 1974); *Leather's Best, Inc. v. S.S. MORMACLYNX,* 451 F.2d 800, 815 (2d Cir. 1971); Simon, *supra* note 21, at 518–19.

**44.** *See Gulf Italia Co. v. The EXIRIA,* 160 F.Supp. 956, 958 (S.D.N.Y.1958), *aff'd,* 263 F.2d 135 (2d Cir. 1959); TETLEY, MARINE CARGO CLAIMS 237 (1965); Simon, More on the Law of Shipping Containers, 6 J. of Mar. L. and Comm. 603, 615 (1975).

**45.** *See* Simon, *supra* note 21, at 518–19.

**46.** This is aptly illustrated by the provisions of the subject bills of lading, especially paragraph 26 on the reverse side which directly contradicts the "letter of guaranty" negotiated by the parties. Bills of lading have in fact been characterized as "contracts of adhesion" with respect to the shipper. *See Caterpillar Overseas, S.A. v. S.S. EXPEDITOR,* 318 F.2d 720, 722 (2d Cir. 1963); Simon, *supra* note 21, at 535; DeOrchis, *supra* note 42, at 258.

**47.** 46 U.S.C. § 801 *et seq.*

**48.** 46 U.S.C. § 812 provides in relevant part:
.    .    .    .    .

Fourth. Make any unfair or unjustly discriminatory contract with any shipper based on the volume of freight offered, or unfairly treat or unjustly discriminate against any shipper in the matter of (a) cargo space accommodations or other facilities, due regard being had for the proper loading of the vessel and the available tonnage; (b) the loading and landing of freight in proper condition; or (c) the adjustment and settlement of claims.
46 U.S.C. § 815 provides in relevant part:
It shall be unlawful for any shipper, consignor, consignee, forwarder, broker, or other person, or any officer, agent, or employee thereof, knowingly and willfully, directly or indirectly, by means of false billing, false classification, false weighing, false report of weight, or by any other unjust or unfair device or means to obtain or attempt to obtain transportation by water for property at less than the rates or charges which would otherwise be applicable.
It shall be unlawful for any common carrier by water, or other person subject to this chapter, either alone or in conjunction with any other person, directly or indirectly—
First. To make or give any undue or unreasonable preference or advantage to any particular person, locality, or description of traffic in any respect whatsoever, or to subject any particular person, locality, or description

this letter does effect a binding allocation of risks under COGSA's $500 package limitation provision, due to its being honored in court as an expression of parties' intent, it apparently violates Tokai's tariff [49] and, more importantly, violates separate provisions of the Shipping Act which require carriers to strictly adhere to their tariffs.[50]

Considering for a moment the relationship between Estrella and Matsushita/Japan, it is clear that there was not and, realistically, could not have been any mutual understanding between them with respect to the COGSA package. They had no dealings, directly or indirectly, yet Estrella is conceded to be a COGSA "carrier" subject, just as Tokai, to the package limitation provision. It is more than conceivable in a situation where, as here, a time-charterer and the vessel owner are both COGSA carriers that a faithful application of the "functional economics" test would result in a different COGSA package and consequent liability for each such carrier—this notwithstanding that both would be liable for the same damage to the same cargo. This illogical result, nowhere hinted at in COGSA, is brought about by the significantly greater task confronting the vessel owner desiring to rebut the initial presumption of the test by producing evidence of the parties' intent.[51]

■■■■■ Accordingly, and for the foregoing reasons, I reject the "functional economics" test as contrary to the statute, commercially impracticable and unwise.[52] This conclusion is amply supported by the Ninth Circuit in *Hartford*.[53] As already

---

of traffic to any undue or unreasonable prejudice or disadvantage in any respect whatsoever: . . . .
Second. To allow any person to obtain transportation for property at less than the regular rates or charges then established and enforced on the line of such carrier by means of false billing, false classification, false weighing, false report of weight, or by any other unjust or unfair device or means. . .

Although this Court makes no express finding in this regard, it would appear that a carrier who reaches an agreement with a particular shipper as to what constitutes a COGSA package while remaining at liberty to enter different, even inconsistent, agreements with other shippers has created a preference violative of the above sections. This would especially hold true where the "functional economics" test is the rule because such agreements would then undeniably affect the value of the carriage contract.

**49.** Tokai tariff, Rule No. 16 and paragraph 108(d), read in conjunction with paragraph 26 of Tokai's bills of lading each set out in this opinion, *supra*.

**50.** 46 U.S.C. § 817(b)(1) and (3). *See Gilbert Imp. Hard., Inc. v. 245 Pkgs. of Guatambu Sq.,* 508 F.2d 1116, 1120–21 (5th Cir. 1974).

**51.** Of course the terms of the bill of lading might well be considered evidence of intent—although hardly a mutual intent with respect to the vessel owner who did not issue it—but the vessel owner is deprived of all *direct* evidence of intent because he did not participate in the carriage contract negotiations.

**52.** Assuming *arguendo*, however, that this test was the applicable rule, I would make the following findings based upon the evidence before me:
(a) Matsushita's goods were shipped in packages suitable for break bulk carriage using normally prudent stowage techniques and, therefore, were "functionally" packaged.
(b) Neither Tokai nor Estrella has successfully rebutted the presumption, raised by the above finding, that the shipper's cartons were COGSA packages each subject to the $500 limitation of 46 U.S.C. § 1304(5).
In reaching this finding I gave no consideration to the legal effect, contractual or evidentiary, of the "letter of guaranty." This is because any effect given it could only serve to reinforce my finding. In a different case, under this test, it might be necessary to decide whether such a letter, if invalid as a preference or tariff violation, might nonetheless have evidentiary value as an expression of intent.
As for the bill of lading provision in paragraph 26, *supra* in text, it carries little weight toward establishing intent, being a unilateral, self-serving declaration by the carrier which was not negotiated by the parties and could scarcely be discerned by the unaided eye in the maze of microscopic and virtually illegible provisions on the backs of the bills of lading. *See Shinko Boeki Co., Ltd. v. S.S. PIONEER MOON,* 507 F.2d 342, 344–45 (2d Cir. 1974); *Leather's Best, Inc. v. S.S. MORMACLYNX,* 451 F.2d 800, 804, 815–16 (2d Cir. 1971); *Encyclopedia Britannica, Inc. v. S.S. HONG KONG PRODUCER,* 422 F.2d 7, 14–15 (2d Cir. 1969); Simon, *supra* note 21, at 534–36.

**53.** 491 F.2d 960 (9th Cir. 1974) discussed in text, *supra*.

observed, the *Hartford* Court stated that the term "package" was to be given its "plain, ordinary meaning" and not some "specialized or technical meaning." Such an approach to construction would seem to preclude giving any legal effect, except co-incidental, to a privately conceived definition of the parties. The same opinion also warned that technological advancements "do not justify any overextension of the statutory term 'package.'"[54] As authority for this proposition the Court cited *Leather's Best* to which I now turn in the search for a workable test.

The crux and basic grounding of *Leather's Best* is captured in the following statement found therein:

> Still we cannot escape the belief that the purpose of § 4(5) of COGSA was to set a reasonable figure below which the carrier should not be permitted to limit his liability and that "package" is thus more sensibly related to the unit in which the shipper packed the goods and described them than to a large metal object, functionally a part of the ship, in which the carrier caused them to be "contained."[55]

Although this approach has not completely escaped criticism,[56] there is, nonetheless, much to commend it. It gives needed recognition to the responsibility of the courts to construe and apply the statute as enacted, however great might be the temptation to "modernize" or reconstitute it by artful judicial gloss. If COGSA's package limitation scheme suffers from internal illness, Congress alone must undertake the surgery.[57] There is, in this regard, obvious wisdom in the Ninth Circuit's conclusion in *Hartford* that technological advancements, whether or not foreseeable by the COGSA promulgators, do not warrant a distortion or artificial construction of the statutory term "package". A ruling that these large reusable metal pieces of transport equipment qualify as COGSA packages—at least where, as here, they were carrier-owned and supplied—would amount to just such a distortion.

Certainly, if the individual crates or cartons prepared by the shipper and containing his goods can rightly be considered "packages" standing by themselves, they do not suddenly lose that character upon being stowed in a carrier's container. I would liken these containers to detachable stowage compartments of the ship.[58] They simply serve to divide the ship's overall cargo stowage space into smaller, more serviceable loci. Shippers' packages are quite literally "stowed" in the containers utilizing stevedoring practices and materials analogous to those employed in traditional on board stowage.[59] The logic of this view is made plainer yet upon noting, as previously discussed in *Sumitomo,* that Tokai's bills of lading cover every piece of cargo packaged by Matsushita/Japan but in no way affect title to the containers, which remains in Tokai. This fact underscores the fundamental distinction between the shipper-packaged goods and the carrier-owned containers.[60]

The Ninth Circuit in *Hartford* reasoned that "package" must be given its plain, ordinary meaning. I now hold that the individual cartons stowed within the Tokai containers constitute the COGSA packages to which the $500 limitation ap-

54. *See* notes 37–39, *supra,* and accompanying text.

55. 451 F.2d 800, 815 (2d Cir. 1971).

56. *See* DeOrchis, *supra* note 42.

57. Arguments, for example, concerning the achievement of a more desirable accommodation of interests as between shippers' and carriers' insurance companies are properly addressed to Congress, not the courts. *See* Simon, *supra* note 44, at 616.

58. *See,* in this regard, *In Re Pacific Far East Lines, Inc.,* 314 F.Supp. 1339, 1350 (N.D.Cal. 1970).

59. *See* Simon, *supra* note 21, at 515.

60. To me, it does not seem reasonable to treat as the "package" of certain goods—using that term as it is commonly understood—a thing whose ownership does not follow title to the goods. One does not, for example, speak of a truck full of shipped goods as the "package" for those goods.

plies, and that this reflects the plain, ordinary meaning of this term.[61]

▓ There remains only the need to comment briefly on the practical ramifications of this ruling. First, it negates the possibility of an unacceptable result where a carrier's container holds the packaged goods of multiple shippers.[62] Recognizing that the container is ship's transport equipment rather than a COGSA package readily yields a meet solution. Second, I find uncompelling the carriers' complaint that it is somehow unfair to base their liability on the number of packages inside the container when they often do not have that information.[63] If this problem exists, it is largely of the carriers' own making and can be easily rectified by merely insisting, as a precondition to carriage, that shippers supply carrier with a package count and set it forth in the bill of lading.[64] Carriers are hardly helpless to secure this information and will not be heard to argue their self-imposed ignorance as a countervailing consideration. Finally, while the result reached herein seems satisfactory in all cases where the carrier furnishes the containers, the appropriate application of the COGSA package limitation to containers owned by a shipper or any person other than the carrier such as a freight forwarder must await future determination. Nonetheless, I would hope the reasoning and principles upon which the instant decision rests may provide some assistance.

## CONCLUSION

Accordingly, Estrella's package limitation defense in *Sumitomo* is disallowed, and the Clerk is directed to enter judgment against Estrella in the stipulated amount of $21,749.75 with costs herein to be taxed. In *Matsushita* defendants Tokai and Estrella are entitled to limit their joint and several liability to $500 per shipper's carton rather than per container. If the parties are unable to agree on damages by May 31, 1976 a Special Master will be appointed for the purpose of ascertaining plaintiffs' damages. The foregoing shall constitute the Court's findings of fact and conclusions of law in both causes pursuant to Fed.R.Civ.P. 52(a). Counsel for Matsushita is directed to prepare and submit an Interlocutory Decree in conformance herewith.

**61.** Defendants' contention that, failing in their "package" argument, the container should be deemed the "customary freight unit" within 46 U.S.C. § 1304(5) and thus subject to the $500 limitation is without merit. Although defendants correctly point out that the freight for this shipment was computed on a flat per-container rate, they do not read this section of COGSA correctly. By its own terms the limitation applies only to "goods not shipped in packages". These electrical goods were shipped in packages.

**62.** This potential problem under 46 U.S.C. § 1304(5) was alluded to in *Rosenbruch v.* *American Export Isbrandtsen Lines, Inc.,* 357 F.Supp. 982, 985 (S.D.N.Y.1973).

**63.** *See* Simon, *supra* note 21, at 535; DeOrchis, *supra* note 42, at 252, 257, 279. Note also that Tokai required this type of information under the terms of its tariff, paragraph 108(a), set out in the text *supra.*

**64.** COGSA exonerates the carrier if shipper supplies fraudulent information concerning either the nature or the value of the shipment. 46 U.S.C. § 1304(5).