**WIRTH LIMITED and Hoesch Siegerlandwerke A. G. Siegen, Plaintiffs-Appellees,**

**v.**

**S/S ACADIA FOREST and LASH Barge No. CG–204 et al., Defendants,**

**Eurogulf Lines d/b/a Central Gulf Contramar Line, Defendant-Appellant.**

**No. 74–2871.**

United States Court of Appeals, Fifth Circuit.

Aug. 30, 1976.

Rehearing and Rehearing En Banc Denied Oct. 14, 1976.

---

Robert B. Acomb, Jr., Herschel E. Richard, Jr., John J. Broders, Ernest A. Carrere, Jr., New Orleans, La., for defendant-appellant.

Henry J. Read, A. Gordon Grant, Jr., New Orleans, La., for plaintiffs-appellees.

Before BROWN, Chief Judge, GEWIN and THORNBERRY,* Circuit Judges.

JOHN R. BROWN, Chief Judge:

The ill-fated voyage of LASH[1] Barge CG–204 has given rise to important and yet unanswered questions under the Carriage of Goods by Sea Act (COGSA), 46 U.S.C.A. §§ 1300–1315.[2] Contrary to the holding of the trial court, we believe that LASH barges are "ships" as defined by COGSA and accordingly we reverse and remand.

### LASH is Born and LASH is Borne

Essential to the understanding of the legal issues spawned by the facts of this particular case is a familiarity with the innovative means of maritime shipment developed in the late 1960's and early 1970's which is referred to as the LASH system.

The basic principle is that an ocean vessel is designed to lift on board and carry specially designed barges which are fully loaded with cargo.[3] The barges are loaded at remote points on inland rivers or other waterways which are inaccessible to deep draft ocean vessels.[4] The barges are then towed from the inland ports where they receive the cargo to the deep water port where they rendezvous with the ocean vessel and are loaded aboard for the ocean segment of the journey. At the deep water port of destination, the barges are unloaded and towed to inland ports or places for discharge at the agreed destination. A principal advantage of the concept is that throughout the course of the shipment the cargo never leaves the barge eliminating the cost, time and pilfering hazard of break-bulk handling. In an operational sense each stage of the process is a part of the integrated whole transportation system. To service its fleet of LASH mother ships the carrier built over 400 LASH barges which were deployed to effectuate loading or discharge of the contained cargo before or after the mother ship's arrival or departure.

### Barging Into The Lock

■ The shipper's brief[5] succinctly describes the events leading to the collision with the lock. At the time of the collision, the LASH Barge CG–204 and five other LASH barges were being towed from Brake, Germany to a rendezvous or collecting point in Bremerhaven for eventual loading and carriage aboard the S/S ACA-

---

\* Judge Thornberry was a member of the panel that heard oral arguments but due to illness did not participate in this decision. The case is being decided by a quorum. 28 U.S.C. § 46(d).

1. Adding another acronym, LASH stands for Lighter Aboard Ship.

2. COGSA was originally enacted in §§ 1–16. Sections 1301–1309 of the USC compilation of the statute correspond to original §§ 1–9, and §§ 1310–15 correspond to original §§ 11–16. For utility to the working Bar (and Bench) we use the code rather than the enactment sections.

3. The vital statistics of LASH systems can be summarized as follows:

| | | Ocean Vessel | Barge |
|---|---|---|---|
| LASH | Length | 860' | 61½' |
| (83 barges can be | Beam | 108' | 31½' |
| carried on the ocean | Draft | 37' | 13.0' |
| vessel that has ca- | | | |
| pacity for additional | | | |
| cargo) | | | |
| Dead weight | | 47,500 Tons | 85 Tons |

4. App. at 255.

5. See Brief at 4–5.

DIA FOREST to the port of New Orleans.[6] In order to reach the collecting point, it was necessary for the tow to navigate the Nordschluese Lock in the lower reaches of the Wesser River. Three tugs, the HANSEAT II, the CITO, and the GUNTHER, were used for this tow. The CITO was attached to the lead barge CG–204 by means of a bridle and a tow line. The HANSEAT II, the steering tug, was secured to the starboard side of the last LASH barge by means of three lines. One line ran forward from the starboard forward side of the HANSEAT II to a bollard on the starboard forward end of the next-to-last LASH barge in the flotilla. A spring line ran from the port forward side quarter of the HANSEAT II to the after starboard bollard of the last barge in the flotilla. Another line ran from the port midship bollard of the HANSEAT II to the after port quarter bollard of the last barge in the flotilla.[7] This was the line that parted. The tug GUNTHER was secured to the port side of the last barge in the flotilla in a manner similar to that used to secure the HANSEAT II.

The trip from Brake to Bremerhaven was uneventful. As the tow approached the Nordschleuse Lock, the tide was ebbing.

Approaching and entering the lock during ebb tide conditions was an intricate, but not an unusual, navigational maneuver. As the flotilla entered the fore-port of the lock, the ebbing tide began to swing the stern section of the tow to port. In order to correct this, Captain Kruse gave the HANSEAT II 30° to 35° port rudder and ordered his engines full ahead. The purpose of this maneuver was to check the swing of the tow. Contemporaneously, the Tug GUNTHER which was pushing the flotilla from the port side of the stern ordered full astern and the Tug CITO which was pulling the flotilla by a bridle turned hard to port.

In the course of these actions with the head of the tow swinging to starboard the stern line which connected the HANSEAT II to the starboard side of the last barge parted and the tug swung away from the barge. Shortly thereafter, the lead LASH Barge CG–204 struck the side of the mole sustaining damage which resulted in its sinking and the damage to the shipper's cargo.

### The Parties Spar Off

The Carrier defended on the basis of § 1304(2)(a) of COGSA asserting that the injury to the cargo resulted from errors in navigation.[8] The Shipper, on the other

---

6. We have no difficulty in finding that the threshold jurisdictional requirement of § 1300 of COGSA, 46 U.S.C.A. § 1300, is satisfied. This opening section prescribes:

"Every bill of lading or similar document of title which is evidence of a contract for the carriage of goods by sea to or from ports of the United States, in foreign trade, shall have effect subject to the provisions of this chapter."

Here the so-called Barge Bill of Lading calls for transportation from Brake, Germany to New Orleans, Louisiana and designates the barge as the carrier. See ¶ 2 of the LASH BARGE CONDITIONS OF CARRIAGE segment of the Bill of Lading. App. at 335. The B/L undertook, however, to prescribe that disputes "shall be governed by Belgian law, in which the Hague Rules [1924] are incorporated." And only as a possible anchor to windward in the event Belgian law was not legally available did the B/L conditionally provide for COGSA "or to the Hague Rules, as enacted in" the USA to cover the entire time the goods were in carrier's custody, including periods of carrier actual custody, if any, before the goods were loaded on the barge or discharged therefrom.

As we discuss later, this was not transportation by a foreign vessel from one German port to another because such carriage is generally prohibited by German law. See Supplemental Briefs on German Law. Rather, it was but the first leg of a shipment in foreign trade which was to terminate in a port of the United States.

7. There apparently exists a factual dispute between the parties as to whether the line which broke was attached to the bollard amidship or the stern bollard of the HANSEAT II. We need not enter this controversy because this fact does not affect the legal issues presented by this appeal.

8. 46 U.S.C.A. § 1304(2)(a) provides:

(2) Neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from—

(a) Act, neglect, or default of the master, mariner, pilot, or the servants of the carrier in the navigation or in the management of the ship;

hand, argues that (i) COGSA does not apply to this movement because this LASH Barge is not a ship engaged in foreign commerce, and (ii) in any event since the damage was caused by the unseaworthiness of the stern line running from tug HANSEAT II to the last barge, the Carrier is liable for the cargo damage. The District Court held that Barge CG–204 was not a "ship" and then proceeded to hold Carrier liable for unseaworthiness of the parted line.

### Looking Back From LASH

Our principal task in this case is to determine what Congress would have thought about a subject about which it never thought or could have thought and one about which we have never thought nor any other Court has thought.[9] Technology has

created a maritime transportation system unlike any which was in existence in 1936 when Congress enacted COGSA.

Before the enactment of statutes governing the relationship between carriers and shippers the general law of admiralty imposed upon the carrier the duty virtually to insure the safe carriage of the cargo.[10] All the shipper had to do to prove his case was to show that the carrier received the cargo in good order [11] and the carrier would be liable for damage to the cargo unless it resulted from an act of God, of the public enemy, or inherent vice of the goods and the carrier was not negligent or otherwise at fault.[12]

This situation prompted carriers to try to limit contractually their liability [13] by in-

---

Its forerunner was § 3 of the Harter Act, 46 U.S.C.A. § 192:
> If the owner of any vessel transporting merchandise or property to or from any port in the United States of America shall exercise due diligence to make the said vessel seaworthy and properly manned, equipped, and supplied, neither the vessel, her owner or owners, agent, or charterers, shall become or be held responsible for damage or loss resulting from faults or errors in navigation or in the management of said vessel nor shall the vessel, her owner or owners, charterers, agent, or master be held liable for losses arising from dangers of the sea or other navigable waters, acts of God, or public enemies, or the inherent defect, quality, or vice of the thing carried, or from insufficiency of package, or seizure under legal process, or for loss resulting from any act or omission of the shipper or owner of the goods, his agent or representative, or from saving or attempting to save life or property at sea, or from any deviation in rendering such service. Feb. 13, 1893, c. 105, § 3, 27 Stat. 445.

9. Our Brother of the Second Circuit, Judge Friendly, has preceded us in unwinding a similar knot:
> Our principal task, in this diversity of citizenship case, is to determine what the New York courts would think the California courts would think on an issue about which neither has thought. They have had no occasion to do so. But life, here coupled with death, casts up new problems, and the court seised of the case is obliged, as best it can, itself to blaze the trail of the foreign law that it has been directed to follow.

See *Nolan v. Transocean Air Lines,* 2 Cir., 1960, 276 F.2d 280, 281, *set aside,* 365 U.S. 293, 81 S.Ct. 555, 5 L.Ed.2d 571, *on remand,* 290 F.2d

904, *cert. denied,* 368 U.S. 901, 82 S.Ct. 177, 7 L.Ed.2d 96.

10. The general liability of the carrier, independently of any special agreement, is familiar. He is chargeable as an insurer of the goods, and accountable for any damage or loss that may happen to them in the course of the conveyance, unless arising from inevitable accident,—in other words, the act of God or the public enemy.

*New Jersey Steam Navigation Co. v. Merchants Bank of Boston,* 47 U.S. (6 How.) 344, 381, 12 L.Ed. 465 (1848). *Accord, The Propeller Niagara v. Cordes,* 62 U.S. (21 How.) 7, 22–23, 16 L.Ed. 41 (1858). See also Note, *Error in Navigation or Management of Vessels: A Definitional Dilemma,* 13 Wm. & Mary L.Rev. 638 (1972).

11. *See* G. Gilmore & C. Black, *The Law of Admiralty,* at 140 (2d ed. 1975) [*hereinafter referred to as* Gilmore & Black].

12. *See,* Gilmore & Black at 140 n.2 *citing*:
> *Propeller Niagara v. Cordes,* 62 U.S. (21 How.) 7, 23 (1859); *The Willdomino,* 300 F. 5, 9, 1924, A.M.C. 889 (3d Cir. 1924), affirmed 272 U.S. 718, 47 S.Ct. 261, 71 L.Ed. 491 (1927); Knauth, Ocean Bills of Lading 116 (4th ed. 1953). Probably the best extended discussion is in Carver, Carriage of Goods by Sea 1–20 (12th ed. 1971). These common law "exceptions" are stated by different authorities in slightly variant forms. See also Note, 32 Neb.L.Rev. 600, 601–602 (1953).

13. The rapid development of steam shipping after the War between the States was accompanied by a like expansion of the use of shipping documents which often included clauses designed to eliminate or limit a carrier's liabili-

serting exculpatory clauses in the B/L, but unlike English courts,[14] United States courts voided clauses exempting carriers from liability for losses caused by their negligence[15] as against public public policy.[16]

This state of the law put American shipowners at a great disadvantage, and to ameliorate this problem Congress in 1893 enacted the Harter Act, 46 U.S.C.A. §§ 190–96, which was designed to strike a balance between the interests that sought to fully exonerate the carrier from all claims based on his negligence and on the other hand, the shippers and commercial interests who wished to hold the carriers

responsible for the consequences of any sort of negligence.[17]

While the compromise reflected by the Harter Act served to protect cargo shippers' interest with respect to litigation in American courts, shippers in most[18] of the other countries of the world were still at the mercy of the stringent exoneration clauses or at least divergent judicial interpretation of them which carriers continued to carefully insert in Bills of Lading. This state of affairs spawned a demand by cargo and commercial, banking and underwriter interests at the World Shipping Conference of 1920 to put the Harter Act principle into effect generally.[19]

ty against tort or contract claims. For an excellent and exhaustive discussion of the history of maritime carriage which led to the enactment of the Hague Rules and their United States progeny, COGSA, see Knauth, *Ocean Bills of Lading—1953* 115–33 (4th ed. 1953) [*hereinafter referred to as* Knauth].

**14.** The English shipowners were powerful in Parliament and they used their influence to block legislation. Their counsel argued successfully to prevent judicial decision from limiting their ability to insert clauses in Bills of Lading which exonerated them from virtually all types of negligence. *See* Knauth at 120; *see also* Gilmore & Black at 142 n.10.

**15.** *Railroad Co. v. Lockwood*, 1873, 84 U.S. (17 Wall.) 357, 381–84, 21 L.Ed. 627. *See* H. Bear, *Admiralty Law of the Supreme Court* 380–81 (2d ed. 1969).

**16.** *See Liverpool & Great Western Steam Co. v. Phenix Ins. Co.*, 1889, 129 U.S. 397, 438–63, 9 S.Ct. 469, 470–80, 32 L.Ed. 788. Interestingly, there were state decisions which followed the British rule allowing negligence exceptions in the B/L before federal supremacy in substantive maritime matters was firmly established. *See, e. g., Rubens v. Ludgate Hill S.S. Co.*, N.Y.Sup.Ct., 1892, 65 Hun. 625, 20 N.Y.S. 481, *affirmed without opinion*, 1894, 143 N.Y. 629, 37 N.E. 825.

**17.** *See* Gilmore & Black at 143. *See also* Note, 13 Wm. & Mary L.Rev., *supra*, at 639.

**18.** Canada, Australia, New Zealand, and in related form, Morocco were quick to enact statutes similar to the Harter Act. *See* Knauth at 125.

**19.** The B/L involved here was expressly made subject to Belgian Law in which the Hague Rules are incorporated. *See, e. g.*, Clause 3(a) of the Barge B/L:

3. a) The contract evidenced by this Bill of Lading, and all disputes arising thereunder, shall be governed by Belgian Law, in which the Hague Rules, as adopted by the Brussels Convention of 25 August, 1924, are incorporated (Article 91 of Book II of the Belgian Commercial Code). This clause shall apply without any prejudice to legal provisions stated in clauses hereafter.

Although the Hague Rules under Belgian Law probably vary little, if any, from the corresponding COGSA provisions which bear on this case, we are aware of the so-called "Clause Paramount" contained in § 1312 of COGSA which requires each Bill of Lading evidencing a contract for carriage of goods from the ports of the United States to contain a statement that it shall be subject to COGSA:

*Provided further*, That every bill of lading or similar document of title which is evidence of a contract for the carriage of goods by sea from ports of the United States, in foreign trade, shall contain a statement that it shall have effect subject to the provisions of this chapter.

Of course, this section does not strictly apply because this is a contract of carriage *to, not from*, the United States.

Thus, even if the Hague Rules were incongruous with COGSA, the latter would prevail. However, in apparent accordance with the "Clause Paramount" principle this Bill of Lading in paragraph 3(c) contains a "subject to" clause:

c) If liability for any loss or damage to the goods is to be determined by the law of a country which does not recognize or give effect to the foregoing Belgian law, or which does not give effect to the foregoing provisions of Paragraph b) of this clause, this Bill of Lading shall have effect subject to the provisions of the United States Carriage of Goods by Sea Act, approved April 16, 1936, or to the Hague Rules, as enacted in that

The Hague Rules, promulgated by the Brussels Convention of August 25, 1924 after strenuous efforts by international legal and maritime groups beginning in 1921,[20] were the international adaptation of the Harter Act compromise, but the United States did not ratify the convention or enact COGSA, which was a statutory codification of the Hague Rules, until 1936.[21]

COGSA has superseded the Harter Act with respect to foreign trade and is incorporated by reference in every B/L for foreign transport[22] to or from the United States. However, the Harter Act still applies in coastwise transport in the United States and to the period of time before loading or after discharge of the cargo.[23]

### A Maritime Kangaroo

■ Is a kangaroo any the less a kangaroo because during part of its existence it is carried in a specially adapted berth aboard another kangaroo? Our answer is no. And upon the same rationale we hold that a LASH Barge is no less a COGSA "ship"[24] engaged in foreign commerce simply because it is designed to be carried during part of the voyage by the mother ship.

The LASH Barges are designed to be carried by the mother ship. They are no less a part of it than its boilers or engines. And certainly without the barges the utility of the ocean vessel as an instrument of foreign trade would be substantially lessened.

Thus we have no difficulty in distinguishing on their facts the Harbor Lighter cases relied upon by the Shipper[25] for the proposition that lighters are not considered ships under COGSA. In those cases the courts were careful to point out that harbor light-

country, which shall govern throughout the entire time the goods are in the Carrier's custody, including periods of the Carrier's actual custody, if any, before the goods are loaded on the barge and after discharge therefrom, and nothing herein contained is to be deemed a surrender by the Carrier of its rights, immunities, exemptions or limitations or an increase of any of its responsibilities or liabilities thereunder.

Regardless of whether these parties are obligated to insert a "subject to" clause in the B/L in compliance with § 1312, it is quite clear that § 1300 subordinates B/L provisions to COGSA when the B/L is for the carriage of goods either *to or from* the United States and regardless of whether the B/L contains a "subject to" clause. *See* note 22, *infra* and accompanying text.

**20.** Except for subsequent insubstantial modifications the final text was hammered out at the October 1922 meeting of the Fifth International Diplomatic Conference on Maritime Law, to which Judge Charles M. Hough of the Second Circuit was designated a delegate by the State Department and was the presiding officer of the conference. *Knauth* at 127. Judge Hough was one of the Nation's outstanding admiralty Judges. Whether his effective leadership and influence in helping construct this important convention would have been available under today's standards of judicial ethics, (see Canons of Judicial Conduct, Canon 5(g)), is doubtful.

**21.** Interestingly, one of the primary factors which led to the ratification of the Hague Rules convention and the enactment of COGSA was

the desire by Congress to correct the excessive burden placed upon carriers by the Supreme Court's extreme decision in 1933 of the *Isis* (*May v. Hamburg-Amerikanische Packetfahrt Aktiengesellschaft*), 1933, 290 U.S. 333, 54 S.Ct. 162, 78 L.Ed. 348, 1933 A.M.C. 1565, which required the carrier to prove that due diligence had been exercised to make the ship *in all respects* seaworthy, regardless of whether the unseaworthiness bore a causal connection to the damages, as a condition precedent to securing Harter Act exoneration from errors in management and faults of navigation. *See* Knauth at 129.

This holding was the result of the Court's broad interpretation of the requirement contained in § 3 of the Harter Act, 46 U.S.C.A. § 192, that the owner of the vessel exercise "*due diligence* to make the said vessel in all respects seaworthy . . ." (emphasis supplied). *See* note 8, *supra* where § 192 is set out in its entirety. The rule of the *Isis* much increased the cost of investigation, the scope of the testimony, and often led to unjust results.

**22.** *See* Gilmore & Black at 147–48.

**23.** *Id.* at 145. *See also* note 19, *supra*.

**24.** § 1301. Definitions
When used in this chapter—
(d) The term "ship" means any vessel used for the carriage of goods by sea.

**25.** *See Isthmian Steamship Co. v. California Spray Chemical Corp.*, 9 Cir., 1961, 290 F.2d 486; *Remington Rand, Inc. v. American Export Lines*, S.D.N.Y., 1955, 132 F.Supp. 129, 137–38.

ers were not vessels used in foreign commerce but rather were utilized only for harbor transportation from the vessel to the dock.[26] Here, the LASH Barges are perhaps the most important link in this maritime transportation system engaging in foreign commerce. The cargo is loaded aboard the barge at the foreign port and never leaves it until it is unloaded at its final destination. From the beginning until the end of the voyage the barge is a carrying vessel, and as such, is involved in every stage of the foreign transport rather than merely performing a shuttle service from ship to shore or vice versa.

Further, it should be recognized that the "tackle to tackle" coverage of COGSA has been held by courts to extend from the receiving tackle of the carrier's first lighter to the delivery tackle of the carrier's last lighter, when the lighterage phase is part of the whole transportation system.[27]

We reject the invitation of the Shipper—in its understandable zeal for a pre-Harter Act pre-COGSA desire for almost absolute liability—to allow LASH Barges to float on the waterways of the world without a flag[28] and not subject to controlling United States standards such as COGSA, governing the relation between shippers of cargo and the party undertaking to provide water transportation. If this were the case, as the Shipper urges, the barge would be subject to general maritime law[29] and, as discussed above,[30] would be unconditionally liable for injury to the cargo except for the pre-Harter exceptions.

■ Such an interpretation would defeat the primary purpose of COGSA which is to protect carriers engaged in foreign trade to and from the United States against such all-encompassing liability, while protecting the shippers' interest by assuring that due care is exercised in making the ship seaworthy and care is taken in stowing the cargo.[31] The barge transport phase of the LASH system is as much a part of the whole system of foreign shipment as the ocean phase of the journey, and the carrier should have the same statutory duties and exemptions during both stages of transport.

### German Regulation Of LASH Barges On German Waterways But Bound For The Bounding Main

In analyzing Shipper's implicit contention that the LASH barge during the local tow movement is, for all practical purposes, a ship without a country, a big question arises: Unless the local transportation leg is an integral part of the intended through movement to an American port, would the Republic of Germany allow this to be done in a foreign bottom?

26. See, e. g., Remington Rand, Inc. v. American Export Lines, supra, at 137–38.

27. See, e. g., The Jupiter (Nelson v. United States), 9 Cir., 1945, 149 F.2d 692, 1945 A.M.C. 1161; cf. Colton v. New York & Cuba Mail Steamship Co., 2 Cir., 1928, 1928 A.M.C. 1161 (construing the Harter Act). See generally Knauth at 233–34.

28. Each barge is, of course, built to coast guard standards and classifications, and is under Customs registry.

29. According to the supplemental briefs of the litigants, German statutes and regulations are not directly applicable to the relationship and liabilities between the shipper and a foreign carrier.

30. See notes 10–12, supra, and accompanying text.

31. § 1303. Responsibilities and liabilities of carrier and ship—Seaworthiness
    (1) The carrier shall be bound, before and at the beginning of the voyage, to exercise due diligence to—
    (a) Make the ship seaworthy;
    (b) Properly man, equip, and supply the ship;
    (c) Make the holds, refrigerating and cooling chambers, and all other parts of the ship in which goods are carried, fit and safe for their reception, carriage, and preservation.
    (2) The carrier shall properly and carefully load, handle, stow, carry, keep, care for, and discharge the goods carried.

■ Acting on the assumption that the clear policy of the United States forbidding coastwise or intercoastal (via the Panama Canal) transportation except in American bottoms [32] is shared by all maritime powers,

32. 46 U.S.C.A. § 883 provides:

**§ 883. Transportation of merchandise between points in United States in other than domestic-built or rebuilt and documented vessels**

No merchandise shall be transported by water, or by land and water, on penalty of forfeiture thereof, between points in the United States, including Districts, Territories, and possessions thereof embraced within the coastwise laws, either directly or via a foreign port, or for any part of the transportation, in any other vessel than a vessel built in and documented under the laws of the United States and owned by persons who are citizens of the United States, or vessels to which the privilege of engaging in the coastwise trade is extended by section 13 or 808 of this title: *Provided,* That no vessel having at any time acquired the lawful right to engage in the coastwise trade, either by virtue of having been built in, or documented under the laws of the United States, and later sold foreign in whole or in part, or placed under foreign registry, shall hereafter acquire the right to engage in the coastwise trade: *Provided further,* That no vessel of more than five hundred gross tons which has acquired the lawful right to engage in the coastwise trade, by virtue of having been built in or documented under the laws of the United States, and which has later been rebuilt, shall have the right thereafter to engage in the coastwise trade, unless the entire rebuilding, including the construction of any major components of the hull or superstructure of the vessel, is effected within the United States, its Territories (not including trust territories), or its possessions: *Provided further,* That this section shall not apply to merchandise transported between points within the continental United States, including Alaska, over through routes heretofore or hereafter recognized by the Interstate Commerce Commission for which routes rate tariffs have been or shall hereafter be filed with said Commission when such routes are in part over Canadian rail lines and their own or other connecting water facilities: *Provided further,* That this section shall not become effective upon the Yukon River until the Alaska Railroad shall be completed and the Secretary of Commerce shall find that proper facilities will be furnished for transportation by persons citizens of the United States for properly handling the traffic: *Provided further,* That this section shall not apply to the transportation of merchandise loaded on railway cars or to motor vehicles with or without trailers, and with their passengers or contents when accompanied by the operator thereof, when such railroad cars or motor vehicles are transported in any railroad car ferry operated between fixed termini on the Great Lakes as a part of a rail route, if such car ferry is owned by a common carrier by water and operated as part of a rail route with the approval of the Interstate Commerce Commission, and if the stock of such common carrier by water, or its predecessor, was owned or controlled by a common carrier by rail prior to June 5, 1920, and if the stock of the common carrier owning such car ferry is, with the approval of the Interstate Commerce Commission, now owned or controlled by any common carrier by rail and if such car ferry is built and documented under laws of the United States: *Provided further,* That upon such terms and conditions as the Secretary of the Treasury by regulation may prescribe, and, if the transporting vessel is of foreign registry, upon a finding by the Secretary of the Treasury, pursuant to information obtained and furnished by the Secretary of State, that the government of the nation of registry extends reciprocal privileges to vessels of the United States, this section shall not apply to the transportation by vessels of the United States not qualified to engage in the coastwise trade, or by vessels of foreign registry, of (a) empty cargo vans, empty lift vans, and empty shipping tanks, (b) equipment for use with cargo vans, lift vans, or shipping tanks, (c) empty barges specifically designed for carriage aboard a vessel and equipment, excluding propulsion equipment, for use with such barges, and (d) any empty instrument for international traffic exempted from application of the customs laws by the Secretary of the Treasury pursuant to the provisions of section 1322(a) of Title 19, if the articles described in clauses (a) through (d) are owned or leased by the owner or operator of the transporting vessel and are transported for his use in handling his cargo in foreign trade; and (e) stevedoring equipment and material, if such equipment and material is owned or leased by the owner or operator of the transporting vessel, or is owned or leased by the stevedoring company contracting for the lading or unlading of that vessel, and is transported without charge for use in the handling of cargo in foreign trade: *Provided further,* That upon such terms and conditions as the Secretary of the Treasury by regulation may prescribe, and, if the transporting vessel is of foreign registry, upon his finding, pursuant to information furnished by the Secretary of State, that the government of the nation of registry extends reciprocal privileges to vessels of the United States, the Secretary of the Treasury may suspend the application of this section to the transportation of merchandise between points in the United States (excluding transportation between the continental United

we posed questions[33] to counsel and requested that they submit supplemental briefs elucidating the pertinent German Law.

■ These briefs indicate that in the absence of an exception granted by the Federal Water and Shipping Administration (Wasser-und Schiffahrtsdirektion—WUS),[34] German law prohibits a foreign vessel from transporting goods from one port to another for delivery within Germany.[35] Only

> States and noncontiguous states, districts, territories, and possessions embraced within the coastwise laws) which, while moving in the foreign trade of the United States, is transferred from a nonself-propelled barge certified by the owner or operator to be specifically designed for carriage aboard a vessel and regularly carried aboard a vessel in foreign trade to another such barge owned or leased by the same owner or operator, without regard to whether any such barge is under foreign registry or qualified to engage in the coastwise trade.
> The policy is to protect and develop American merchant marine, shipbuilding, seamen, etc. *See Marine Carriers Corp. v. Fowler*, 2 Cir., 1970, 429 F.2d 702, 708, *citing Pennsylvania R.R. v. Dillon*, 1964, 118 U.S.App.D.C. 257, 335 F.2d 292, 295 n.5; Merchant Marine Act of 1920, ch. 250, 41 Stat. 988 (preamble); S.Rep.No. 870, 74th Cong., 1st Sess. (1935); H.R.Rep. No. 1947, 74th Cong., 1st Sess. (1935); Morse, *A Study of American Merchant Marine Legislation*, 25 Law & Contemp. Prob. 57 (1960).

33. In determining whether the LASH Barges are "ships", "vessels", "carriers", etc. under COGSA, the Court requests supplemental briefs on the law, statutory and judicial, of Germany.

> (1) What statutes, ordinances, regulations or other legislative materials apply to the movement of cargo wholly within the territorial boundaries of Germany with respect to the nationality of the carrying craft?
> (2) Consistent with such laws, etc. of Germany, may goods (cargo) be moved on a non-German craft from one German port or place of origin to another port or place within Germany with the intention of terminating the delivery at such German point?
> (3) Is any permit, application, license, etc. required to permit such transportation as covered in (2) above? If so, what, or what terms and from whom?
> (4) Under German law may goods (cargo) be transported on non-German vessels (barges, etc.) from a port or place of origin in Germany to another port or place within Germany if such goods (cargo) are destined for

when such domestic transport is merely a leg of a journey which is to terminate in a foreign port is such intrastate transportation from one German port to another allowed.[36] Accordingly, we must conclude that the LASH Barge transportation from Brake and Bremmer to Bremerhaven was intended to be a component part of the larger enterprise of foreign transport to the United States, for unless we ascribe this meaning the transaction would have been unlawful.[37]

> loading on a non-German vessel for transportation to the United States? If so, what permits, etc. are required? If not, why not? Specify reasons, etc.

34. Shipper's counsel correctly points out that an exception was requested and granted by WUS in this case that related primarily to the make-up of the tow, the number and sufficiency of the tugs and other matters primarily related to safety. There is nothing in this record to indicate that the WUS permits were related to anything other than safety.

35. In response to our question (1) Dr. Albrecht, Shipper's expert on German law, succinctly stated the general rule in Germany as follows:

> 1. According to the "Gesetz über die Küstenschiffahrt" (Law concerning Coastal Maritime Traffic) of July 26, 1957, Federal Gazette 1957, part II, page 738) the carriage against remuneration of passengers or goods by sea ways from one place in the Federal Republic of Germany (Saarland excepted, Berlin included) to another place within the same is allowed only for
> 1.1 sea vessels flying the federal German Flag,
> 1.2 inland vessels being registered in a federal German ship register and possessing the certificates required according to § 6 "Binnenschiffsuntersuchungsordnung" (Ordinance concerning Vessels' Safety for Traffic on Inland Water Ways of July 18, 1956, Federal Gazette 1956, part II, page 769).
> Exceptions may be permitted on appliance only by the competent "Wasser-und Schiffahrtsdirektion" (decentralized authority of the Federal Water and Shipping Administration).

\* \* \* \* \* \*

36. Dr. Albrecht answered question (4):

> 4. To my knowledge it is not generally forbidden to carry cargo on non-German craft from a place in Germany to a German port when the cargo is loaded on a non-German sea vessel destined for the United States, *always provided the non-German carrier for the inland carriage is identical with the sea carrier and that he has taken over the cargo at the first place of loading* (emphasis supplied).

37. We do not undertake to determine German law. We have used the responses of the ex-

## LASH Fits In With The Old

Our holding is in accord with the viewpoint taken by other courts in deciding cases involving related problems that vessels which are part of a common maritime enterprise should be viewed as *one vessel* in the eyes of the law. One such case decided prior to the 1936 enactment of COGSA was *Sacramento Navigation Co. v. Salz,* 1927, 273 U.S. 326, 47 S.Ct. 368, 71 L.Ed. 663, 1927 A.M.C. 397, which involved a Bill of Lading for transportation aboard a barge which was to be propelled by a tug. The tug negligently caused the barge to collide with an anchored vessel, which resulted in the total destruction of the cargo.

In construing § 3 of the Harter Act[38] which is, of course, very similar to § 1304 of COGSA in language and operation,[39] Mr. Justice Sutherland framed the issue as "whether the barge alone or the combination of tug and barge was the 'vessel transporting' the barley, within the meaning of the Harter Act."[40] Considering the language of the Bill of Lading,[41] the circumstances, and the intent of Congress,[42] the

perts of both Shipper and Carrier to demonstrate the existence of a strong German policy comparable to ours (see note 32, *supra*) against local movements in foreign bottoms. The Clerk of this Court is directed to maintain permanently copies of these supplemental briefs and responses and forward copies to the District Court on remand. If on remand, the German law becomes significant, it can be properly established for determination by the Trial Judge.

**38.** *See* note 8, *supra.*

**39.** Professors Gilmore and Black point out that the similarities of COGSA and Harter far outweigh the differences which are in many respects merely verbal or stylistic. Thus, it has become a universal practice to cite Harter Act cases to COGSA points. *See* Gilmore & Black at 148–49.

**40.** *Sacramento Navigation Co. v. Salz,* 1927, *supra* at 327–28, 47 S.Ct. at 369, 71 L.Ed. at 665.

**41.** In construing the Bill of Lading the Court stated:

Considering the language of the bill of lading in the light of all the circumstances, it is manifest that we are dealing with a single contract and the use of the tug must be read into that contract as an indispensable factor in the performance of its obligations. To transport means to convey or carry from one place to another; and a transportation contract for the barge without the tug would have been as futile as a contract for the use of a freight car without a locomotive. In this view, by the terms of the contract of affreightment, in part expressed and in part necessarily resulting from that which was expressed, the transportation of the goods was called for not by the barge, an inert thing, but by the barge and tug, constituting together the effective instrumentality to that end.

*Id.* at 329, 47 S.Ct. at 369, 71 L.Ed. at 665–66.

**42.** The Court further buttressed its holding that the barge and the tug constituted one vessel by turning to other analogous precedent in interpreting the Congressional intent:

In the light of the decisions presently to be noted, the words, a "vessel transporting merchandise," etc., are entirely appropriate to describe the combination now in question, and we see no reason to think that Congress intended that they should not be so applied. This court and other federal courts repeatedly have held that such a combination constitutes, in law, one vessel. See *The Northern Belle (The Keokuk v. Home Ins. Co.)* 9 Wall. 526, 528, 529, 19 L.Ed. 746, 747; *The Civilta,* 103 U.S. 699, 701, 26 L.Ed. 599, 600; *The Nettie Quill* [5 Cir., 124 F. 667] supra; *The Columbia* [9 Cir.], 44 U.S.App. 326, 73 F. 226, 19 C.C.A. 436; *The Seven Bells,* 241 F. 43, 45, 154 C.C.A. 43; *The Fred W. Chase* [4 Cir.], (D.C.) 31 F. 91, 95; *The Bordentown* (D.C.), 40 F. 682, 687; *State v. Turner,* 34 Or. 173, 175, 176, 55 P. 92, 56 P. 645.

In *The Northern Belle,* supra, this court, speaking of a combination of barge and steamboat, said that "the barge is considered as belonging to the boat to which she is attached for the purposes of that voyage." In *The Civilta,* supra, a tug and a ship which she was towing by means of a hawser were held to be in contemplation of law "one vessel, and that a vessel under steam." In *The Columbia,* 44 U.S.App. 326, 73 F. 226, 19 C.C.A. 436, it was held that a barge having no motive power and a tug belonging to the same owner and furnishing the motive power constituted one vessel for the purposes of the voyage. In that case, wheat was to be transported by means of the barge, and the owner of the barge and tug undertook the transportation. The court said (p. 447): "As the wheat was to be carried on board the barge, which had no motive power, of necessity such power had to be supplied by the carrier. . . . When the tug made fast and took in tow the barge, to perform the contract of carriage, the two became one vessel for the purpose of that voyage,—as much so as if she had been taken bodily on

Court concluded that the barge and the tug constituted one vessel in the eyes of the law and accordingly held that the barge would not be liable for damage to the cargo caused by negligence of the towing vessel.

Likewise, courts construing the Shipowners' Limited Liability Act, 46 U.S.C.A. §§ 181–89, have held that when vessels are engaged in a common transportation enterprise they should often be considered one vessel for limitation purposes. In *Short v. The Columbia*, 9 Cir., 1896, 73 F. 226, the Court held in a case factually similar to ours that the barge and tug were one vessel for limitation of liability purposes. Similarly, in *Standard Dredging Co. v. Kristiansen*, 2 Cir., 1933, 67 F.2d 548, *cert. denied*, 1934, 290 U.S. 704, 54 S.Ct. 372, 78 L.Ed. 605, the Court held that the owner must surrender all those vessels which share in the execution of the venture, and the Court further stated they were collectively viewed as one vessel.[43]

More recently, this Circuit in reliance on the single vessel theory held that the entire flotilla of barges engaged in a common maritime dredging operation should be surrendered for limitation of liability purposes.

*See In re Drill Barge No. 2*, 5 Cir., 1972, 454 F.2d 408, *cert. denied*, 406 U.S. 906, 92 S.Ct. 1610, 31 L.Ed.2d 816. *See also Brown & Root Marine Operators, Inc. v. Zapata Offshore Co.*, 5 Cir., 1967, 377 F.2d 724. *See generally* Annot., Flotilla or Several Vessels of Same Owner as Liable Under Federal Statute Providing for Limitation Of Shipowner's Liability (46 U.S.C.A. § 183(a)), 9 A.L.R.Fed. 768 (1971).

### The LASH Barge Is A Ship Under COGSA

COGSA in § 1304(2)(a) (note 8, *supra*) provides that "[n]either the carrier nor the ship shall be responsible for loss or damage arising or resulting from—(a) Act, neglect, or default of the master, mariner, pilot, or the servants of the carrier in the navigation or in the management of the *ship*." (Emphasis added.) Ship is defined elsewhere as "any vessel used for the carriage of goods by sea." § 1301(d). It is argued by the Shipper that this section is inapplicable to a barge because the barge is more akin to a container than a ship.

In answering this argument we must once again broaden our perspective

---

board the tug, instead of being made fast thereto by means of lines." It was, accordingly, held that, without surrendering both vessels, the owner was not entitled to the advantages of Revised Statutes, §§ 4283 et seq., Comp.Stat. § 8021, 6 Fed.Stat.Anno. 2d ed. p. 336, providing for a limitation of liability of "the owner of any vessel," etc. *Id.* at 330–31, 47 S.Ct. at 370, 71 L.Ed. at 666.

**43.** Judge Learned Hand analogized the situation in the Limitation of Liability setting to that "one vessel" theory applied by the Supreme Court in *The Sacramento* with respect to § 3 of the Harter Act, 46 U.S.C.A. § 192, as follows: "* * * whatever may be thought of the law before 1927, *Sacramento Nav. Co. v. Salz*, 273 U.S. 326, 47 S.Ct. 368, 370, 71 L.Ed. 663, settled it. True, that case arose under section 3 of the Harter Act (46 U.S.C.A. § 192), but the court expressly declared that the question was the same in cases of limitation. A tug and her barge in tow were treated as a single vessel, because owned in common and engaged in a common enterprise, and the doctrine of *The Columbia*, supra (C.C.A.) 73 F. 226, was used as the keystone of the reasoning. The court thought *Liverpool, etc., Nav. Co. v. Brooklyn Eastern Terminal*, supra, 251 U.S. 48, 40 S.Ct. 66, 64

L.Ed. 130, plainly distinguishable; it was concerned with 'a pure tort; no contractual obligations were involved.' When they are, it is possible to regard an 'entire flotilla * * as one vessel for the purposes of the undertaking in which the common owner was engaged.' In that case the relevant inquiry is, 'what constituted the vessel by which the contract of transportation was to be effected.' In view of this language and of the use made of *The Columbia*, supra (C.C.A.) 73 F. 226, when the duty involves 'contractual obligations,' the whole flotilla embarked in the enterprise is the 'vessel'; a conclusion which would comprise not only the barge here, but the two attending tugs as well."

"We do not so understand *Sacramento Nav. Co. v. Salz*, supra, 273 U.S. 326, 47 S.Ct. 368, 71 L.Ed. 663; rather we read it as meaning that when the duty violated, though imposed by law, presupposes at least the relation of master and servant, the owner must surrender all those vessels which share in the execution of the venture; collectively they are 'such vessel' within R.S. § 4283 (46 U.S.C.A. § 183)."

67 F.2d at 550–51.

and view the LASH Transportation System as a whole. We would reemphasize that from physical characteristics and the governmental status of the barges as registered under American laws, see note 28, *supra*, and approved under applicable construction-design standards,[44] these barges qualified as a vessel authorized to engage in foreign trade to and from the United States.[45] In addition, they were in a real sense a vessel since they were loaded and thereafter nothing was discharged until delivered to the consignee's indicated destination. And for the purposes of this limited leg the transportation had to be an integral part of the foreign commerce to avoid illegality under German law.

■ This approach is corroborated by the B/L's in this case, to which, however, we attribute only slight significance in view of the COGSA restrictions on diminishing a carrier's obligations.[46]

The structure of the LASH B/L condition was to divide it into two parts, (i) the LASH Barge and (ii) the ocean movement. As to (i) the "LASH Barge" conditions provided for the physical movement of the barges[47] and that the term "carrier" included the LASH Barges.[48] It then undertook

**44.** In view of this turn in the case we intimate no decision on the attack, urged by Shipper, but not reached by the trial court, that by design these single skin barges were unseaworthy to withstand foreseeable marine casualties in the course of tow at leading or discharge ports. This is open on remand.

Since it surely was a "vessel capable of water movement," that reduces the question to whether it was a vessel "for the carriage of goods by *sea*", § 1301(d), note 24, *supra*. That "sea" is not to be read literally is demonstrated by the expansive reach of COGSA under §§ 1300, 1312 (see notes 6 and 19, *supra*) and 1302. Thus, a shipment originating, say, in the port of Houston for discharge at Rotterdam, or one from Chicago to Liverpool, is covered during the inland movement even though it would strain a landlubber's definition of "sea" to think that Buffalo Bayou or the St. Lawrence Seaway was a part of the briney deep. But clearly such shipments would be subject to COGSA for cargo damage during the protected non-salt water leg of the voyage.

**45.** The following statutory sections are some of the many provisions governing the inspection, registration, and documentation of vessels: 46 U.S.C.A. §§ 2, 11–82, 252–55, 262–80, 840.

LASH Barge CG–204 registration and inspection documents are set out at App. 355–63.

**46.** 46 U.S.C.A. § 1303(8) provides:

**Limitation of liability for negligence**

(8) Any clause, covenant, or agreement in a contract of carriage relieving the carrier or the ship from liability for loss or damage to or in connection with the goods, arising from negligence, fault, or failure in the duties and obligations provided in this section, or lessening such liability otherwise than as provided in this chapter, shall be null and void and of no effect. A benefit of insurance in favor of the carrier, or similar clause, shall be deemed to be a clause relieving the carrier from liability.

Apr. 16, 1936, c. 229, § 3, 49 Stat. 1208.

The corresponding section of the Harter Act is 46 U.S.C.A. § 190:

**§ 190. Stipulations relieving from liability for negligence**

It shall not be lawful for the manager, agent, master, or owner of any vessel transporting merchandise or property from or between ports of the United States and foreign ports to insert in any bill of lading or shipping document any clause, covenant, or agreement whereby it, he, or they shall be relieved from liability for loss or damage arising from negligence, fault, or failure in proper loading, stowage, custody, care, or proper delivery of any and all lawful merchandise or property committed to its or their charge. Any and all words or clauses of such import inserted in bills of lading or shipping receipts shall be null and void and of no effect. Feb. 13, 1893, c. 105, § 1, 27 Stat. 445.

**47.** Clause one of the LASH Barge Conditions of Carriage provides:

1. After the loading of the goods into/on the barge named herein at the barge loading point, said barge will be towed/pushed to the rendezvous point where the barge and its contents will be loaded on the ocean vessel named herein, or substitute, for ocean transportation to the de-barging point named herein or as near thereto as the ocean vessel may safely get, lie and leave, always afloat, where the barge will be discharged from the ocean vessel and then towed/pushed to the barge destination named herein or so near thereto as said barge may safely get, lie and leave, always afloat.

**48.** The Ship's Bill of Lading provides in pertinent part:

2. The term—Carrier—wherever used in this Bill of Lading, shall mean Eurogulf Lines, Inc., and shall include the barge named herein or substitute.

to prescribe that only LASH Barge conditions would apply.[49] And then by an adroit emphasis or limitation, it specified that for non-LASH shipments the general ship conditions would apply[50] so that the "carrier" was the shipowner alone.[51]

If—as we hold—the LASH Barge is a "ship" and the entire foreign shipment to the United States is covered by COGSA, any effort by the carrier to chop up responsibilities between the legs of the journey would fall under § 1303(8) (note 46, *supra*). Thus the outcome depends on our interpretation of the statute rather than punctilious compliance with the language and meaning of the Bill of Lading. *See Zajicek v. United Fruit Co.*, 5 Cir., 1972, 459 F.2d 395, 399; Longley, *Common Carriage of Cargo* 32–33 (1967).[52]

If we adopted the viewpoint that such a LASH Barge was not a ship under COGSA, the liability of the carrier would vary according to the place of the injury even though his undertaking under the obvious arrangement of affreightment did not change. For instance, if the damage to the cargo caused by the carrier's negligence occurred while the barge was over or aboard the ocean vessel, COGSA would be applicable, for no one doubts that the ocean vessel is a ship. But if the damage occurred before the barge was over or loaded aboard, under the strained interpretation of COGSA which the shipper would have us adopt, COGSA would not apply,[53] or if it did, this barge would not be allowed the defense of § 1304(2)(a) until it was loaded over or aboard even though the cargo was never removed and the conditions of carriage did not significantly change.

### Unseaworthiness Of The Barge Not Reached

Although we are urged by Shipper to affirm on the trial court's alternative ground that the Barge-flotilla was unseaworthy, we decline to do so. It is evident from our legal holding that COGSA and the § 1304(2)(a) error-in-navigation defense is available, but the trial court never examined the case in that light. The fact-findings on this and related issues do not meet the Plimsoll line[54] of F.R.Civ.P. 52(a).[55]

**49.** "CARRIERS' OPTION CLAUSE: Carrier has the right to decide in its own option and discretion which cargoes will be shipped in LASH-barges and which will be shipped in General ships. In case of carriage by LASH barge, only LASH–SHIP TERMS AND CONDITIONS WILL APPLY. In case of carriage by General ship, only General ship terms and conditions will apply."

Since this cargo was loaded in a LASH Barge, it is evident that the carrier looked upon it as such and was bound by the LASH provisions of the B/L.

But as we emphasize and reemphasize our determination rests on COGSA so we regard as inconsequential the dispute as to whether the so-called B/L issued by the carrier's agent at the interior loading point, but undelivered contemporaneously to the shipper's representative, constituted a binding B/L. Cf. COGSA § 1303(3), (7); *Knauth* at 142, 150–51.

**50.** See note 49, *supra*.

**51.** "DEFINITION. Whenever the term Merchant is used in this Bill of Lading it shall be deemed to include the Shipper, the Receiver, the Consignee or any other Holder of the Bill of Lading authorized as such by [illegible], as well as the Owner of the [illegible]. The term Carrier only shall refer to Eurogulf Lines, Inc."

**52.** On our reading of the underlying relation and the transaction in light of COGSA, the result is the same as though, as in competitor Lykes' B/L's, the documents prescribed:

"Throughout this bill of lading the term *'ship'* or *'vessel'* shall be deemed to mean: (a) Before the Seabee Barge is placed aboard, and after it is removed from the Seabee Ship, the Seabee Barge in which the cargo was actually being carried; . . ." (emphasis added)

Almost identical language was cited by one commentator as that which would insure the barge was a ship within the meaning of COGSA. *See* Hickey, *Legal Problems Relating to Combined Transport and Barge Carrying Vessels,* 45 Tulane L.Rev. 863, 900 n.151 (1971).

The registration papers of LASH Barge CG–204 appear at App. 355–63.

**53.** *See* Hickey, *supra,* 45 Tulane L.Rev. at 893–94.

**54.** *See, e. g., Theodories v. Hercules Navigation Co.,* 5 Cir., 1971, 448 F.2d 701, 704–05, and cases cited therein.

**55.** In *Dowell v. United States,* 5 Cir., 1975, 522 F.2d 708, 714–15 we said:

We need not and do not find the District Court's findings of fact to be clearly erroneous. Cf. F.R.Civ.P. 52(a). Rather, as we

It is quite possible that on our deliverance the Judge might hold among other things that the extremis position of the flotilla was due to crowding the right side of the entrance bay to the locks, that the stern line parted from a last minute effort to extricate the tow from this peril which put a breaking stress on the stern line beyond the capacity of even a brand new acceptable line for such anticipated operations, a combination of both,[56] or a variety of other

> have many times done, they cannot be accepted since the District Court applied the wrong legal standard to the evidence before it in concluding that the expenditures were adequately substantiated under § 274(d).
> *See also*
> *Battelstein Investment Co. v. United States,* 5 Cir., 1971, 442 F.2d 87; *Continental Motors Corp. v. Continental Aviation Corp.,* 5 Cir., 1967, 375 F.2d 857; *Fulton National Bank v. Tate,* 5 Cir., 1966, 363 F.2d 562.

**56.** *The Vallescura,* 1934, 293 U.S. 296, 55 S.Ct. 194, 79 L.Ed.2d 373, 1934 A.M.C. 1573.

**57.** *See, e. g., Kessler v. Pennsylvania Nat'l Mutual Casualty Ins. Co.,* 5 Cir., 1976, 531 F.2d 248, 249 n.2 and cases cited therein.

**58.** To illustrate in a little more tangible way, the trial court determined that the accident was caused by unseaworthiness but there was—without intimating any conclusions on our part—substantial evidence to the contrary. For instance, the testimony of Captain Kruze, the skipper of the HANSEAT II, could be interpreted to indicate error in navigation in attempting to cope with the ebb tide and the resulting extremis. App. at 117–18. Likewise, the testimony of Captain Essmann, the skipper of the Tug GUNTHER, indicates that the stern line of the HANSEAT II parted when Captain Kruze was attempting to catch up to the flotilla after he had lost control in the ebb tide. App. at 132–33.

> The carrier also presented the opinion of a qualified expert, Captain Voss, that the accident was a result of an error in navigation:
> It is my opinion therefore that the collision of the train of barges with the south mole sheet piling was not due to the parting of the stern line of the tug HANSEAT II. Rather was the pushing unit too close to the south mole when the starboard swinging motion became evident rendering it impossible for the initiated measures of the three tugs to take effect in time.

> We agree with the District Court's evidentiary ruling that this was admissible since Voss was deposed and examined under oath. Its weight is for the District Court under the standards we prescribe on COGSA.

circumstances which we cannot fathom from this sketchy record.

■ We should not at this stage undertake to analyze either the Tinker-to-Evers-to-Chance [57] undulating shifts of burden of proof on seaworthiness, diligence and the like [58] or the ultimate legal significance of who wins in this jousting of things proved, not proved, or not contested or the hopes of simply winning on an unfulfilled burden of proof.[59]

> The record does not reflect that the shipper presented any affirmative evidence as to why the line broke or the condition of the cable. The shipper merely relied on the carrier's evidence showing the line broke and argued that this was proof enough of unseaworthiness since the line was in the exclusive control of the carrier or its agents. To the contrary, there are several passages in the record which indicate that the line was very new and adapted to its function after the WUS trial runs leading to the permit, *see* note 34, *infra.* App. at 53, 112, 383, 389.

**59.** For example, the carrier urges that when it maintains the defense of error-in-navigation, the burden shifts to the shipper to prove the accident was caused in whole or in part by unseaworthiness of the vessel. *Director General of India Supply Mission v. The S/S Maru,* 2 Cir., 1972, 459 F.2d 1370, 1372; *Firestone Synthetic Fibers Co.—Division of Firestone Tire & Rubber Co. v. M/S Black Heron,* 2 Cir., 1963, 324 F.2d 835, 837; *Wilbur Ellis v. The M/V Captayannis,* D.Or., 1969, 306 F.Supp. 866, aff'd, 9 Cir., 1971, 451 F.2d 973. And both seem to agree with the Second Circuit's summary in S/S Maru:

> "Where the carrier has brought itself, as in this case, within the excepted peril of negligent navigation, the burden then shifts to the cargo owner to establish that the unseaworthiness caused the damages sought. 'Therefore, once a carrier has brought forth evidence establishing the defense of error in management, the burden is on the shipper to show that the ship was unseaworthy and the damages were caused by such unseaworthiness.' *Firestone Synthetic Fibers Co. v. M/S Black Heron,* 324 F.2d 835, 837 (2nd Cir. 1963)." *Director General of India Supply Mission,* 459 F.2d at 1372.

On the other hand shipper urges that if unseaworthiness is merely a contributing cause of the mishap, this forecloses the carrier from relying upon § 1304(2)(a), and pursuant to the strictures of § 1303 of COGSA, the carrier would be responsible for the damage to the cargo. *See Union Carbide & Carbon Corp. v. The Walter Raleigh,* S.D.N.Y.1953, 109 F.Supp.

*Remand*

The case therefore has to go back for initial factual and legal determination in the light of our significant holding either on the present record or with such evidentiary additions as the parties and the District Court, in the first instance, deem appropriate. We sound the caveat that except for the legal holding on the application of COGSA to LASH Barge CG–204, and the legal availability of all COGSA defenses (and rights) including § 1304(2)(a), the District Court is unfettered in its crucial factfindings by anything we have said.

All we have said is what Congress would have said on a matter on which they have not said, *see* note 9, *supra.*

REVERSED and REMANDED.

781, *aff'd,* 2 Cir., 200 F.2d 908; *Spencer Kellogg & Sons v. Great Lakes Transit Corp.,* E.D. Mich., 1940, 32 F.Supp. 520; *cf. Firestone Synthetic Fibers Company—Division of Firestone Tire and Rubber Co. v. M/S Black Heron,* 2 Cir., 1963, 324 F.2d 835, 836.

For obvious reasons we do not at this stage—either as the law of the case or stare decisis—attempt to fathom the unfathomable.