The **OMARK INDUSTRIES, INC.**, an Oregon Corporation, Plaintiff,

v.

**ASSOCIATED CONTAINER TRANSPORTATION (AUSTRALIA), LTD.,** a corporation, et al., Defendants.

Civ. No. 75–17.

United States District Court, D. Oregon.

Aug. 19, 1976.

in case of a merger, the *McKee* test would thereby be changed, is totally without merit.

Paul N. Daigle, Souther, Spaulding, Kinsey, Williamson & Schwabe, Portland, Or., for plaintiff.

Peter G. Voorhies, Wood, Wood, Tatum, Mosser & Brooke, Portland, Or., for defendants.

## OPINION

BEEKS, District Judge: *

In this cargo damage action the Court is called upon to construe the package limitation provision [1] of the Carriage of Goods By Sea Act[2] ("COGSA") as applied to "palletized" cargo, that is, cargo arranged upon and secured to wooden pallet boards for ocean transport. The case has been submitted without trial upon stipulated facts and exhibits. Plaintiff Omark Industries, Inc. ("Omark") was the consignee of a quantity of machine tools shipped aboard defendant vessel S.S. DILKARA from Melbourne, Australia to Portland, Oregon in May, 1974. The other defendants (hereinafter collectively referred to as "Carrier") represent the owner, charterer and operator of the DILKARA on the voyage in question.[3]

Omark's tool shipment was prepared for export by Omark Australia, Ltd., shipper, who consolidated the goods into six palletized units and one smaller case. Upon discharge at Portland it was discovered that a sizable quantity of tools packed into three of the palletized units had been pilfered or lost in transit. Carrier does not dispute its liability but seeks to limit same to $500 per palletized unit arguing that such unit con-

---

* The Honorable William T. Beeks, Senior United States District Judge for the Western District of Washington, sitting by designation.

1. 46 U.S.C. § 1304(5) [COGSA Article 4(5)] which provides:

   Neither the carrier nor the ship shall in any event be or become liable for any loss or damage to or in connection with the transportation of goods in an amount exceeding $500 per package lawful money of the United States, or in case of goods not shipped in packages, per customary freight unit, or the equivalent of that sum in other currency, unless the nature and value of such goods

have been declared by the shipper before shipment and inserted in the bill of lading. This declaration, if embodied in the bill of lading, shall be prima facie evidence, but shall not be conclusive on the carrier.

2. 46 U.S.C. § 1300 *et seq.*

3. It does not appear from the record which of the defendants occupied the respective positions of owner, charterer and operator, but each of the *in personam* defendants has stipulated that it is liable for the entire quantum of damages herein recoverable.

stitutes a "package" within the meaning of COGSA Article 4(5) or, alternatively, to $500 per cubic meter of cargo, the "customary freight unit".[4] Omark, on the other hand, contends that the true COGSA packages were the individual cartons forming the constituents of each palletized unit.

Omark and Carrier have stipulated as to the respective amounts for which judgment may be entered in each of three possible resolutions of the limitation question: (1) the $500 COGSA limitation is held applicable to each palletized unit, (2) the limitation is held applicable to the individual cartons or (3) the limitation is held applicable to the customary freight unit. In considering these alternatives I initially find that the $500 limitation does not apply herein to the customary freight unit. The relevant COGSA section[5] provides that the limitation applies to the customary freight unit only where the affected goods were "not shipped in packages." Omark's cargo was well-packaged, thus disqualifying the freight unit from being the appropriate standard of limitation.

From the preceding discussion a single narrow issue for determination emerges: as between the individual cartons and the larger palletized bundles, which is to be treated as the COGSA package for limitation purposes? The proper resolution of this issue requires analysis of prior case law and a more detailed development of pertinent facts.

This Court had recent occasion in *Matsushita Electric Corp. of America v. S.S. AE-GIS SPIRIT*[6] to consider at some length the proper interpretation of the term "package" found in COGSA Article 4(5). The holding in *Matsushita* was that a shipper's cartons, if otherwise properly to be considered COGSA packages, did not subsequently forfeit that status upon being stowed in a carrier's metal shipping container for ocean carriage. While *Matsushita* dealt specifically with containerized cargo, its straightforward approach to the term "package" is no less opportune in the present controversy. In *Matsushita* this Court embraced a simple rule for the identification of the COGSA package, a basic interpretive proposition first propounded by the Ninth Circuit in *Hartford Fire Insurance Co. v. Pacific Far East Lines, Inc.,*[7] to wit:

> [s]ince no specialized or technical meaning was ascribed to the word "package", we must assume that Congress had none in mind and intended that this word be given its plain, ordinary meaning.[8]

This does not seem an especially startling or significant conclusion until one surveys case law in other circuits and scholarly commentaries addressing this question. What presents itself is a confusing array of suggested formulas and criteria for the determination of the COGSA package[9] which too often ignore, or at least obscure, the fact that Congress, from all that can be gathered from the statute and its legislative history, never intended the word "package" to be treated as a sophisticated or esoteric term of art. Giving due recognition to this

---

4. Parties agree and the shipping documents reflect that the "customary freight unit" for the subject shipment was the cubic meter.

5. 46 U.S.C. § 1304(5).

6. 414 F.Supp. 894 (W.D.Wash. 1976).

7. 491 F.2d 960 (9th Cir. 1974).

8. 414 F.Supp. 894, 903 (W.D.Wash. 1976) *quoting from* 491 F.2d 960, 963 (9th Cir. 1974).

9. For a representative sampling of cases and commentaries compare the following: *Cameco, Inc. v. S.S. AMERICAN LEGION,* 514 F.2d 1291 (2d Cir. 1974); *Shinko Boeki Co., Ltd. v. S.S. PIONEER MOON,* 507 F.2d 342 (2d Cir. 1974); *Leather's Best, Inc. v. S.S. MORMACLYNX,* 451 F.2d 800 (2d Cir. 1971); *Standard Electrica, S.A. v. Hamburg Sudamerikanische Dampfschiffahrts-Gesellschaft,* 375 F.2d 943 (2d Cir. 1967); Simon, The Law of Shipping Containers, 5 J. of Mar. L. and Comm. 507 (1974); Simon, More on the Law of Shipping Containers, 6 J. of Mar. L. and Comm. 603 (1975); DeOrchis, The Container and the Package Limitation—The Search for Predictability, 5 J. of Mar. L. and Comm. 251 (1974). For a comparative discussion and evaluation of views expressed in the above cases and commentaries see *Matsushita Electric Corp. of America v. S. S. AEGIS SPIRIT,* 414 F.Supp. 894 (W.D. Wash. 1976).

fact, the analytical framework within which the instant case must be decided becomes clear and uncomplicated. This Court's task, simply stated, is to determine whether the palletized unit or the cartons contained therein best comports with the "plain, ordinary meaning" of the word "package". To thus state the task, however, is not to minimize the potential difficulty which may be encountered in passing upon a given set of facts. Happily, the case at bar admits facile determination.

As previously observed, it was the shipper that prepared these palletized bundles for export shipment. The physical configuration of the bundles is important. Each consisted of 20–26 cardboard cartons [10] arranged in layers and tiers to form a large almost cubical mass which was in turn entirely enclosed by heavy double-wall corrugated cardboard.[11] This cardboard outer shell presented a smooth, uninterrupted surface effectively concealing the cartons within. The bundles thus assembled were then secured to wooden pallets by means of several metal straps running both lengthwise and widthwise around the bundles. The dimensions of each fully assembled and secured unit were approximately 109 × 90 × 120 cm. (42.9 × 35.4 × 47.2 inches).

■ The proper disposition herein is readily apparent from the recited facts. I hold the palletized units, rather than the inner cartons, to be the "packages" to which the COGSA limitation applies. It is evident from the visual appearance [12] of the units as well as from their physical con-

struction that the heavy outer cardboard shell served to consolidate, protect and restrain the smaller, thinner cartons and their contents—thus creating a concededly compound but nonetheless bona fide "package". It matters not that in other circumstances of carriage the inner cartons might be deemed COGSA packages.

■ It should be noted that it is not usually the *smallest* packaged unit incorporated into a shipment that constitutes the COGSA package. On the contrary, the COGSA package will generally be the *largest* individuated unit of packaged cargo made up by or for the shipper which is delivered and entrusted to the carrier. For example, small boxes containing shoes, toasters, toothpaste, soap or comparably small items are obviously and sensibly not to be deemed COGSA packages when, as is customary, they are packed into larger shipping cartons for their protection and handling convenience. That is the normal result conforming to logic and consistent with a non-specialized meaning of "package". On the other hand, one could easily envision certain methods and styles of cargo packaging that might require deviation from this general working guideline and present a perplexing search for the true COGSA package.[13] But the existence of residual areas of uncertainty is not an indictment of the nontechnical approach to Article 4(5), but rather is a regrettable and, probably, inevitable characteristic of 46 U.S.C. § 1304(5) itself which, like countless other

10. The approximate dimensions of the cartons were 33″ × 16″ × 5″ for some and 20″ × 17″ × 6″ for others.

11. The heavy cardboard wrap did not, however, extend across the bottom of the bundles. A much thinner cardboard was employed as a buffer between the pallet and the bundle, the underside of the bundled cargo being well-protected by the pallet board itself.

12. *See* defendants' photographic exhibits.

13. In *Standard Electrica, S.A. v. Hamburg Sudamerikanische Dampfschiffahrts-Gesellschaft*, 375 F.2d 943 (2d Cir. 1967), for example, the palletized units consisted of cartons strapped to the pallet board without any cardboard shell or outer wrapping to en-

close and conceal the cartons. Identification of the COGSA package under such circumstances would not be so straightforward as here where the cartons were fully covered and situated within what was effectively a larger, stronger carton resting upon the pallet. Another thought-provoking application of the package limitation provision, not treated but alluded to in *Matsushita*, would arise in a shipment made up of large shipper-owned and shipper-stuffed metal containers each holding numerous smaller cartons of goods. Whether such a container could sensibly and fairly be considered a "package" as that word is commonly understood must needs await future determination.

statutes, provides challenging judicial work in borderline situations.

A fact which bears emphasis here is that the outer packaging materials surrounding each palletized bundle were an integral part of the cargo. Title to these materials followed the goods and was effectively transferred upon negotiation of the applicable bill of lading. This circumstance lends support to the result reached herein and accords with reasonable expectation in those instances where wrapped goods or goods placed in a receptacle are thought of as constituting a package.

Omark urges that its palletized units should be treated analogously to the carrier's metal containers in *Matsushita.* The suggested analogy, however, does not wash. Containerized cargo can be easily distinguished from palletized cargo for package limitation purposes—at least where, as in *Matsushita,* the containers are owned and supplied by the carrier. Not only is the outer packaging of a palletized unit an integral part of the cargo unlike a container, but also and fundamentally the pallet board and outside wrap of a palletized bundle quite obviously do not resemble, as do containers, "detachable stowage compartments" [14] of the vessel. Neither are they in any sense "functionally part of the ship." [15] Palletized units involved here did not consist of ship-supplied equipment but rather were the shipper's personal work product, his chosen package for ocean transport.

Omark argues that it is being penalized for its decision to better protect the ship-

ment by use of pallets and outer cardboard shells. While this argument has an attractive ring and faintly echoes a point made in *Matsushita,*[16] it misses the mark. Where such greater protection is achieved by means of a larger package, the shipper must settle for less legal protection under COGSA—that, like it or not, is the statutory scheme.

■ Omark further argues that its use of pallets benefited the carrier insofar as its loading and stowing were thereby convenienced and that such a worthy objective should not result in Omark sacrificing protection under 46 U.S.C. § 1304(5). This, too, is a losing argument. The shipper normally packages his own goods and thereby determines, from a practical standpoint, what the COGSA package will be. His subjective purpose in choosing a particular mode of packaging is immaterial under the statute.

■ Finally, both Omark and Carrier direct the Court's attention to certain shipping documents as being indicative of the parties' mutual intention with respect to the COGSA package. This Court determined in *Matsushita* that no legal effect can be given, consistent with COGSA and the Shipping Act,[17] to the parties' private intentions or characterizations regarding the COGSA package.[18] That ruling has equal force here, and such evidence was not considered on the package limitation question.

The Clerk is directed to enter judgment in accordance with the Stipulation Re Dam-

---

**14.** *Matsushita Electric Corp. of America v. S.S. AEGIS SPIRIT,* 414 F.Supp. 894, 907 (W.D. Wash.1976).

**15.** *Leather's Best, Inc. v. S.S. MORMACLYNX,* 451 F.2d 800, 815 (2d Cir. 1971).

**16.** In *Matsushita* this Court noted that the "functional economics" test outlined in two Second Circuit decisions [*Cameco, Inc. v. S.S. AMERICAN LEGION,* 514 F.2d 1291 (2d Cir. 1974) and *Royal Typewriter Co., Division of Litton Bus. Sys., Inc. v. M/V KULMERLAND,* 483 F.2d 645 (2d Cir. 1973)] tended to penalize shippers who chose to economize by utilizing packaging of lesser strength and durability. That observation has no application to this situation where Omark seeks to economize by

employing *larger* rather than more frail packages.

**17.** 46 U.S.C. § 801 *et seq.*

**18.** If the parties to a carriage contract are permitted to define the COGSA package for themselves by express or implied agreement, then carrier's minimum liability established in Article 4(5) becomes, to quote from *Matsushita,* "illusory and negotiable." Such understandings, if recognized and enforced, might also run afoul of 46 U.S.C. §§ 812, 815 to the extent that they created, either presently or potentially, "preferences" or discriminations as between different shippers.

ages and Liability dated June 22, 1976, the Court having now ruled that the COGSA $500 limitation applies to the palletized packages rather than the cartons or freight units. Costs to be taxed against defendants. The foregoing shall constitute the Court's findings of fact and conclusions of law within the meaning of Fed.R.Civ.P. 52(a).