**COMMONWEALTH PETROCHEMI-CALS, INC., et al.**

v.

**S/S PUERTO RICO, her engines, boilers, tackle, etc., Puerto Rico Maritime Shipping Authority and Leonard Bros. Trucking Co.**

**Civ. A. No. M–76–1126.**

United States District Court, D. Maryland.

July 27, 1978.

Donald A. Krach and Barrett W. Freedlander, Baltimore, Md., for plaintiffs.

Geoffrey S. Tobias and Kieron F. Quinn and Ober, Grimes & Shriver, Baltimore, Md., for Puerto Rico Maritime Shipping Authority, defendant.

Samuel S. Smalkin, Baltimore, Md., for Leonard Bros. Trucking Co., defendant.

## OPINION

JAMES R. MILLER, Jr., District Judge.

In his inimitable way, Chief Judge Brown of the Fifth Circuit, in a related but different context, has stated for me the essence of this case. He said in *Wirth Ltd. v. S/S Acadia Forest*, 537 F.2d 1272 at 1276 (5th Cir. 1976), *reh. en banc den.* 541 F.2d 281 (5th Cir. 1976):

"Our principal task in this case is to determine what Congress would have thought about a subject about which it never thought or could have thought and one about which we have never thought nor any other Court has thought. Technology has created a maritime transportation system unlike any which was in existence in 1936 when Congress enacted COGSA." (Footnote omitted).

Presented here is the question of whether a single item of freight, in this case a transformer weighing approximately 44 tons, attached to a "Ro-Ro" "low boy" trailer which was transported by sea aboard the S/S Puerto Rico constitutes a "package" within the meaning of the Carriage of Goods by Sea Act (hereinafter COGSA), 46 U.S.C. § 1301 *et seq.* It is a question of great importance to both carriers and shippers of freight by sea, but, inexplicably, no reported cases have been found relating directly to the application of the COGSA concept of "package" to the rapidly increasing use of "Ro-Ro" ships in ocean carriage.

"Ro-Ro" is an acronym for the term "Roll on-Roll off" which, in turn, describes an innovation in the maritime transportation industry in which wheeled vehicles move on and off a ship via ramps. Commonly, the trailer portions of tractor-trailer rigs are ramped onto ships which have been designed for or converted to "Ro-Ro" operations. The trailers themselves are then secured to specially designed portions of the ship to await arrival of the ship at the destination port where the trailers are reattached to tractors and ramped off the ship to shore. In such an operation, there is normally no shipboard handling or securing of the freight which is carried on the "Ro-Ro" trailers.

The facts of this case are undisputed. The shipping carrier, Puerto Rico Maritime Shipping Authority (PRMSA), has admitted its liability to the plaintiffs, but claims that the damages are limited to $500.

The plaintiffs, Commonwealth Petrochemicals, Inc. and Fluor Engineers and Constructors, Inc. (hereinafter Commonwealth), were the consignees of two 10,000 KV transformers manufactured by the General Electric Company. Each transformer measured 11 ft. 4 in. in height, 10 ft. 2 in. in length, and 11 ft. 2 in. in width, and weighed a net of 47,700 lb. The freight bill and corrected bill of lading for the two transformers showed that each contained 2,696 cu. ft. and that freight was charged on the basis of cubic feet by PRMSA. As part of the manufacturing process, integral lifting lugs were attached to the four upper corners of each transformer for purposes of its movement and transportation. The

manufacturer also mounted and bolted the bottom of each transformer to a heavy angle iron skid. These angle iron skids were approximately 10 ft. long and approximately 11 ft. wide and consisted of angle irons with dimensions of approximately 3″ by 3″. The skids were so positioned in order to protect the transformers during shipment. Thus fastened to their respective skids, the transformers were transported by two "low boy" trailers to Baltimore from the General Electric plant in Rome, Georgia via Leonard Brothers Trucking Company. In Baltimore, the two "low boy" trailers were towed on board the S/S Puerto Rico, owned and operated by PRMSA, for carriage to their destination, San Juan, Puerto Rico.

In the process of loading the transformers onto the low boy trailers in Rome, Georgia, the transformers were lowered by trolley crane onto the flat bed truck trailers which had a drop center. The angle skids were bolted to the base of the respective trailers. Chains, approximately 1¼″ in diameter, were fastened from each of the top corners of the transformers to the sides of the flat bed trailers and tightened by means of ratchets fitted to each chain. Two other links of chain were secured from side to side to the angle iron skids and over and across the flat beds, one being across the front of each transformer and the other being across the back. These chains were also tightened with ratchets. The transformers were unboxed and uncrated except for the porcelain bushings. The porcelain bushings, which are used to connect the power to the transformers, were protected by wooden boxes.

Although the transformers were delivered undamaged to PRMSA in Baltimore, they were observed to be in a damaged condition when the trucking company came on February 3, 1975, to pick up the trailers from the PRMSA lot in San Juan, Puerto Rico. The plaintiffs have abandoned any claim for the slight damage to Transformer No. 888195, but they have shown that Transformer No. 888196 sustained damage to the extent of $13,901.01.

The "low boy" trailers were owned by Leonard Brothers Trucking Company, which rented them to Commonwealth for several weeks. Leonard Brothers, as a common carrier, contracted to deliver the transformers on the trailers from Rome, Georgia to the ship at pier side in Baltimore.

As is customary, PRMSA has a short form and a long form bill of lading. The long form bill of lading commonly is a lengthy document containing in fine print all of the provisions of the tariff of the ocean carrier which has been filed at the Federal Maritime Commission. The short form bill of lading is the working document on which the goods to be shipped are briefly described, the destination stated and the freight charges for that shipment delineated. On the short form bill of lading, few parts, if any, of the long form are restated, and the long form is incorporated by reference.

The short form bill of lading in this case was prepared by the freight forwarder of the plaintiffs. On the short form under the column "No. of Pkgs." was the number "2" and in the corresponding "Description of Pkgs. and Goods" column was the notation "Skids:)", next to which was the word "Transformers." There were, in addition, apparently four boxes of other materials relating to the transformers which are not directly here in issue. On the short form bill of lading in the "No. of Pkgs." column the two skids and the four boxes were totaled and the number "6" inserted in said column. In the "Description of Pkgs. and Goods" column, corresponding to the number "6," were the words "Pcs: _ _ _ Total _ _ _."

On the face of the short form bill of lading, under the aforegoing notations, appear the following words:

"In accordance with the carrier's tariff, carrier's liability shall be limited to no more than $500 per package, piece or customary freight unit when not shipped as package or piece unless a greater value is set forth herein as $_____ and unless shipper pays a charge of 2% of declared

value in excess of $500 which charge is $_____."

The long form bill of lading, incorporated by reference in the short form, provides in paragraph 1, among other things, as follows:

"When this Bill of Lading governs, it is subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April 16, 1936, which are incorporated herein, and nothing herein contained is a surrender by the carrier of any of its rights, immunities or limitations or an increase of any of its responsibilities or liabilities under said Act. *If any term of this Bill of Lading be repugnant to said Act to any extent, such term shall be void to that extent but no further.*

"The carrier shall be entitled to avail itself of all rights, limitations, exemptions and immunities provided for in said Carriage of Goods by Sea Act, although the contract of carriage evidenced by this Bill of Lading may be for the carriage of goods between ports of the United States." (Emphasis supplied).

Paragraph 22 of the long form reads as follows:

"22. VALUATION. In the event of any loss, damage or delay to or in connection with goods exceeding in actual value $500 per package, lawful money of the United States, or in case of goods not shipped *in packages*, per customary freight unit, the value of the goods shall be deemed to be $500 per package or per customary freight unit, as the case may be, and the carrier's liability, if any, shall be determined on the basis of a value of $500 per package or per customary freight unit, unless the nature and a higher value shall be declared by the shipper in writing before shipment and inserted in this Bill of Lading.

\* \* \* \* \* \*

"*It is agreed that the meaning of the word "package" includes animals, pieces and all articles of any description except goods shipped in bulk.*

"In no event shall the carrier be liable for more than the loss or damage actually sustained. The carrier shall not be liable for any consequential or special damage and shall have the option of replacing any lost goods or of replacing or repairing any damaged goods." (Emphasis supplied).

I

The first contention of PRMSA is that the damaged transformer was a "package" under the terms of the contract between the parties and that the liability of PRMSA is limited to $500.

■ Although COGSA does not apply, as a matter of course, to the ". . . carriage of goods by sea between any port of the United States or its possessions, and any other port of the United States or its possessions," 46 U.S.C. § 1312, it provides for incorporation of its terms by reference in that same section when it says:

". . . [A]ny bill of lading or similar document of title which is evidence of a contract for the carriage of goods by sea between such ports, containing an express statement that it shall be subject to the provisions of this chapter, *shall be subjected hereto as fully as if subject hereto by the express provisions of this chapter.*" (Emphasis supplied).

COGSA contains its own limitation of liability clause at 46 U.S.C. § 1304(5):

"Neither the carrier nor the ship shall in any event be or become liable for any loss or damage to or in connection with the transportation of goods in an amount exceeding $500 per package lawful money of the United States, or in case of goods not shipped *in packages*, per customary freight unit, or the equivalent of that sum in other currency, unless the nature and value of such goods have been declared by the shipper before shipment and inserted in the bill of lading. This declaration, if embodied in the bill of lading, shall be prima facie evidence, but shall not be conclusive on the carrier." (Emphasis supplied).

COGSA also provides, 46 U.S.C. § 1303(8):

"Any clause, covenant or agreement in a contract of carriage relieving the carrier or the ship from liability for loss or damage to or in connection with the goods, arising from negligence, fault, or failure in the duties and obligations provided in this section, or *lessening such liability otherwise than as provided in this chapter*, shall be null and void and of no effect. A benefit of insurance in favor of the carrier, or similar clause, shall be deemed to be a clause relieving the carrier from liability." (Emphasis supplied).

PRMSA's position on this point essentially rests upon the Second Circuit's decision in *Pannell v. United States Line Co.*, 263 F.2d 497 (2d Cir. 1959), *cert. den.* 359 U.S. 1013, 79 S.Ct. 1151, 3 L.Ed.2d 1038 (1959). The pertinent clauses of the bill of lading in *Pannell* incorporated COGSA by reference and contained a definition of "package" identical in effect to the one at issue here.[1] The court enforced the bill of lading definition by the following reasoning:

"Where a statute is incorporated by reference its provisions are merely terms of the contract evidenced by the bill of lading. [citations omitted]. Our task therefore, is to construe the contract to give consistent effect, if possible, to all of its terms.

\* \* \* \* \* \*

"The parties have defined what 'package' means in the bill of lading. We see no reason why this specific definition should not prevail over the general term 'package' contained in the Act. It is true that if the Act applied *ex proprio vigore* the yacht, like the tractor in the *Gulf Italia* case [263 F.2d 135 (2d Cir. 1959)], could not be deemed a 'package,' and the parties by so describing it could not reduce the carrier's liability.[2] But we cannot agree with the District Court's view

that because the definition would be void when applied to shipments covered by the Act, it should likewise be ineffective to reduce liability where the Act is not operative as a matter of law. Since the shipper could have declared the value of his yacht and had full protection against damage by paying a higher freight rate, we cannot regard the $500 limitation as in the nature of a 'trap.'" 263 F.2d at 498.

▆▆▆ I cannot agree with the reasoning in *Pannell*. The essence of COGSA is that an ocean carrier should not be permitted to limit its liability below a reasonable figure set in the Act. *See* the legislative history cited in *Wirth Ltd. v. S/S Acadia Forest*, supra, 1276–1277; *Jones v. The Flying Clipper*, 116 F.Supp. 386, 388–89 (S.D.N.Y.1953); Gilmore & Black, *The Law of Admiralty*, 125–26 (1957). *See also* 46 U.S.C. § 1303(8). Expansion of the definition of the word "package" in a bill of lading beyond that meaning which the word has under COGSA transparently is a lessening of the carrier's liability ". . . otherwise than as provided in [COGSA]," 46 U.S.C. § 1303(8). Since the bill of lading herein contained an express statement that it was subject to the provisions of COGSA even though it would not otherwise have been so subject, the bill of lading was ". . . subjected [to COGSA] as fully as if [the bill of lading were] subject [to COGSA] by the express provisions of [COGSA]," 46 U.S.C. § 1312. Therefore, under 46 U.S.C. § 1303(8) any attempt to lessen the liability of the carrier through an expansion of the definition of "package" below the minimum liabilities set by COGSA is invalid. *Pan Am. World Airways v. Cal. Stevedore & Ballast*, 559 F.2d 1173 (9th Cir. 1977); *Shinko Boeki Co., Ltd. v. S.S. "Pioneer Moon,"* 507 F.2d 342 (2d Cir. 1974); *Omark Industries v. Associated*

---

1. The definition included ". . . pieces and articles of any description except goods shipped in bulk." 263 F.2d at 498.

2. In *Pannell*, a yacht in a cradle was carried on deck pursuant to the terms of the bill of lading, and, consequently, COGSA would not have applied, 46 U.S.C. § 1301(c), but for the fact that

the bill of lading expressly made COGSA applicable to that contract of carriage. The majority apparently concluded that the yacht would not have been considered a "package" under COGSA if COGSA had applied *ex proprio vigore*.

*Container, Etc.*, 420 F.Supp. 139 (D.Or. 1976); *Matsushita Elec. Corp. v. S.S. Aegis Spirit*, 414 F.Supp. 894 (W.D.Wash.1976); *Middle East Agency v. The John B. Waterman*, 86 F.Supp. 487 (S.D.N.Y.1949). *See also Leather's Best, Inc. v. S.S. Mormaclynx*, 451 F.2d 800 (2d Cir. 1971); *Hanover Insurance Company v. Drake Marine*, 440 F.Supp. 686 (D.P.R.1977).[3]

 Even if this court, notwithstanding the provisions of 46 U.S.C. § 1312, were to accept the *Pannell* reasoning that a shipping carrier may *partially* incorporate COGSA in a contract of ocean carriage to which COGSA would not otherwise apply, in the present case the bill of lading stated that any term thereof "repugnant to [COGSA] to any extent" would be void. This clause made COGSA paramount to *any* term of the bill of lading.

For the foregoing reasons, if the definition of "package" in clause 22 of the long form bill of lading is more broad than the meaning of "package" in these circumstances under COGSA, the definition in clause 22 is void. This is so even though the tariff, containing the same definition of "package" as the bill of lading, has been filed with the Federal Maritime Commission. The Federal Maritime Commission has no authority to override the requirements of COGSA, *Hanover Insurance Co. v. Drake Marine, supra.*

## II

The next question is whether the transformer for which damages are now sought was a "package" under COGSA.

 In the absence of any legislative history of the intended meaning of the word "package" in COGSA, 46 U.S.C. § 1304(5), courts have struggled with increasing frequency to apply the term to new developments in ocean carriage of freight, most of which were not in use or even thought of when COGSA was enacted. The use of pallets,[4] containers,[5] "lift on-lift off" bulk containers,[6] and LASH (lighter aboard ship)[7] has, in each case, generated litigation as the parties and the courts struggle to apply the "package" liability limitation to new circumstances. Nevertheless, however outmoded one might conclude that the COGSA concept of the definition of limitation of liability in terms of a "package" might be, the function of this court ". . . is not to create *ex nihilo* a fair and equitable rule for allocating risks with respect to . . . cargo; but, rather, to fairly and sensibly interpret the existing

---

**3.** In *Hanover Insurance Company v. Drake Marine*, 440 F.Supp. 686 (D.P.R.1977), the bill of lading for the shipment from New York to San Juan, Puerto Rico apparently incorporated COGSA.

**4.** *E. g., Standard Electrica, S. A. v. Hamburg Sudamerikanische, Etc.*, 375 F.2d 943 (2d Cir. 1967), *cert. den.* 389 U.S. 831, 88 S.Ct. 97, 19 L.Ed.2d 89 (1967) (9 palletized groups, each consisting of 6 cardboard cartons, held to be 9 "packages"); *Menley and James Lab., Ltd. v. M/V Hellenic Splendor*, 433 F.Supp. 252 (S.D. N.Y.1977) (9 palletized groups of 163 cartons held to be 9 "packages"); *Omark Industries v. Associated Container, Etc.*, 420 F.Supp. 139 (D.Or.1976) (each palletized group of approximately 20–26 cardboard cartons held to be a "package").

**5.** *E. g., Rosenbruch v. American Export Isbrandtsen Lines, Inc.*, 543 F.2d 967 (2d Cir. 1976), *cert. den.* 429 U.S. 939, 97 S.Ct. 353, 50 L.Ed.2d 308 (1976) (household goods packed by shipper's agent in large container supplied by the carrier held to be 1 "package"); *DuPont de Nemours International S. A. v. S. S. Mormacve-*

ga, 493 F.2d 97 (2d Cir. 1974), *aff'g* 367 F.Supp. 793 (S.D.N.Y.1972) (38 pallets of resin synthetic liquid in a 40 ft. ocean shipping container held to be 38 "packages"); *Royal Typewriter Co., Div. Litton Bus. Sys. Inc. v. M/V Kulmerland*, 483 F.2d 645 (2d Cir. 1973) (350 cartons of adding machines loaded by shipper's agent in large ocean shipping container of shipper's agent held to be 1 "package"); *Matsushita Elec. Corp. v. S. S. Aegis Spirit*, 414 F.Supp. 894 (W.D.Wash.1976) (a number of cartons in a large ocean shipping container supplied by the carrier held to constitute the number of "packages").

**6.** *E. g., Shinko Boeki Co. Ltd. v. S. S. "Pioneer Moon,"* 507 F.2d 342 (2d Cir. 1974) (24 2,000-gal. tanks furnished by the carrier, used for transporting liquid latex, held not to be "packages").

**7.** *E. g., Wirth Ltd. v. S/S Acadia Forest*, 537 F.2d 1272 (5th Cir. 1976), *reh. en banc den.* 541 F.2d 281 (5th Cir. 1976) (LASH barge held not to be a "package").

legislation. This is often, as here, not easy; but it must be emphasized that such difficulty does not warrant a judicial usurpation of the Congressional prerogative in a well-intentioned effort to remedy obsolete or ill-conceived legislation." *Matsushita Elec. Corp. v. S.S. Aegis Spirit, supra* at 904. *See also Hartford Fire Insurance Co. v. Pacific Far East Line, Inc.,* 491 F.2d 960, 962 (9th Cir. 1974); *Leather's Best, Inc. v. S.S. Mormaclynx, supra* at 814–815.

Although Congress did not leave a trail of legislative history which one can travel to arrive unerringly at the meaning which the word "package" was to have in COGSA, I believe that it is possible to deduce the intent of Congress in a common sense way.

■ COGSA was the result of a compromise, embodied first in the Harter Act, 46 U.S.C. §§ 190–196, then on an international level in the Hague Rules, which "was designed to strike a balance between the interests that sought to fully exonerate the carrier from all claims based upon his negligence and on the other hand, the shippers and commercial interests who wish to hold the carriers responsible for the consequences of any sort of negligence." *Wirth Ltd. v. S/S Acadia Forest, supra,* at 1276–77. The language of the Hague Rules was incorporated into COGSA almost without change, but one revision was made in a section of COGSA now codified at 46 U.S.C. § 1304(5). While the Hague Rules limited a carrier's liability "per package or unit," in enacting COGSA, Congress, after experimenting with different language in several successive bills, ultimately settled upon providing that the $500 limit would apply "per package . . . or in [the] case of goods not shipped in packages, per customary freight unit . . . ." *Id.; Hartford Fire Insurance Co. v. Pacific Far East Line, Inc., supra* at 962; *The Bill,* 55 F.Supp. 780, 782 (D.Md.1944). This change in COGSA made it more clear than do the Hague Rules that the amount of the limitation on the carrier's

liability depends on whether the goods are shipped in a "package" as distinguished from "goods not shipped *in* packages." In the latter case, depending upon the number of "customary freight unit[s]" [8] applicable to the particular nonpackaged goods, liability could well exceed the statutory limit of $500 per package. Obviously, in achieving a compromise among the competing interests, Congress determined to treat goods in packages differently from goods not in packages for the purpose of setting a minimum liability limit below which the carrier could not go.

It makes sense that property enclosed in a package when delivered to the carrier, where the mode of packaging substantially or completely covers the goods in such a way as to conceal their exact character, condition or quantity, should be treated differently from free standing cargo not enclosed in such a way. In the former case, the carrier, in the absence of an express declaration thereof by the shipper, has no direct way of knowing the actual or potential value of the goods contained in the package or their condition when placed in the package, and this lack of knowledge could place the carrier at a disadvantage in determining the precautions, if any, which should be taken to protect especially valuable goods as well as place the carrier at a disadvantage in protecting itself from fraudulent claims. On the other hand, as to goods which are not enclosed before they reach the carrier by some type of covering inhibiting a determination of exactly what the goods are and their general condition, the carrier is in almost as good a position as the shipper to know their general worth, and the carrier is then in a better position to protect the goods and itself. A higher practical limitation on the minimum liability of a carrier is justified in the latter case on that basis.

---

8. The words "customary freight unit" refer to the unit upon which the charge for freight is computed and not to the shipping unit itself, *Gulf Italia Co. v. American Export Lines, Inc.,* 263 F.2d 135, 137 (2d Cir. 1959), *cert. den.* 360 U.S. 902, 79 S.Ct. 1285, 3 L.Ed.2d 1254 (1959); *The Bill,* 55 F.Supp. 780 (D.Md.1944), *aff'd sub nom. Lorentzen v. Brazil Oiticica, Inc.,* 145 F.2d 470 (4th Cir. 1944).

Additionally, the language of COGSA in 46 U.S.C. § 1304(5) differentiates between "packages" and "goods not shipped *in* packages," (emphasis supplied), giving strength to the inference that it was contemplated that packaged goods would be contained within or be inside some type of covering.

*Webster's Third New International Dictionary* (1966), defines a package as:

"A small or moderate-sized pack: bundle, parcel . . . a commodity in its container . . . a covering wrapper or container . . . a protective unit for storing or shipping a commodity."

In *Black's Law Dictionary* (Revised 4th Edition 1968), the word "package" is defined as:

"A bundle put up for transportation or commercial handling; a thing in form to become, as such, an article of merchandise or delivery from hand to hand. . . . Each of the words denotes a thing ·in form suitable for transportation or handling, or sale from hand to hand. . . . As ordinarily understood in the commercial world, it means a shipping package."

While not dispositive, the dictionary definitions of "package" are at least consistent with the concept of goods being covered in some way which would make them "in" a package.

As pointed out by Judge Choy for the Ninth Circuit in *Hartford, supra* at 963--964, British courts, in interpreting the term "package" in a British statute similar to COGSA which, unless a greater value had been declared for the goods, limited the carrier's liability for goods "contained in any parcel or package," adopted the concept that the preparation of goods for transportation, by packing in a container or with an outside covering, in such a way as to conceal the details of the condition, character or identity of the goods, constituted them as a "package."

As Judge Choy also pointed out in *Hartford, Id.*, "[s]ince no specialized or technical meaning was ascribed to the word 'package,' we must assume that Congress had none in mind and intended that this word be given its plain, ordinary meaning." Improvements or modifications in the technology of the maritime transportation industry do not create any judicial right to expand the meaning of the statutory term used by Congress. *Hartford, Id.*

In *Hartford* the court, giving the word "package" its "plain, ordinary meaning," 491 F.2d at 963, held that a 36,700 pound free standing electrical transformer which was shipped uncrated, but which was attached to wooden skids designed to facilitate its transportation, did not constitute a package within the meaning of COGSA's liability limitation. Although PRMSA has criticized this ruling as a reincarnation of Mr. Justice Stewart's famous comment about pornography[9] which stands for the proposition that "an object is a package when we say it is a package," I view the Ninth Circuit test as closer to the mark than that which has evolved in several cases in the Second Circuit.

I take the Ninth Circuit test to be that the layman's every day concept of a package is that it is something which is covered partially or completely in the course of preparation for transportation or handling in such a way as to preclude facile identification of the exact character or quantity of the goods contained therein or of their condition. To that extent, I believe that the Ninth Circuit test is a workable one which comports with the "plain, ordinary meaning" of the word "package." As noted by Judge Beeks in *Omark Industries v. Associated Container, Etc., supra*, ". . . the COGSA package will generally be the *largest* individuated unit of packaged cargo made up by or for the shipper which is delivered and entrusted to the carrier. For example, small boxes containing shoes, toasters' toothpaste, soap or comparably

---

9. Justice Potter Stewart acknowledged his difficulty in defining hard-core pornography, saying, "[b]ut I know it when I see it." *Jacobellis v. Ohio*, 378 U.S. 184 at 197, 84 S.Ct. [1676] at 1683, 12 L.Ed.2d 793 (1964) (concurring opinion of Stewart, J.).

small items are obviously and sensibly not to be deemed COGSA packages when, as is customary, they are packed into larger shipping cartons for their protection and handling convenience. That is the normal result conforming to logic and consistent with a non-specialized meaning of 'package.'" 420 F.Supp. at 142.

Thus where shippers or their agents fill their own large ocean going containers with their goods in the absence of the carrier's agent being present to observe and check the operation, effectively concealing the goods when they are delivered in the container to the carrier, the container constitutes the "package." [10] On the other hand, in the case of a large ocean shipping container supplied by the carrier, which the carrier itself or by its agent loads or checks the loading of, so that the goods contained therein are not in any way concealed from the carrier when the goods are entrusted to the carrier, the container is not a package, but the largest individuated units of packaged cargo made up by or for the shipper which are carried within the container would be the "packages." In such latter case, the container, rather than being the shipper's "package," is a functional part of the ship.[11]

While the size, shape or weight [12] is not determinative, what is determinative is the presence or absence of the practical ability of the carrier to determine the character, condition or quantity of the goods when they are entrusted to it by the shipper without having to change, remove or alter the condition of the goods as entrusted to it.

Utilizing the test which this court believes appropriate, it is apparent that it makes no difference if a trailer upon which the freight, whether in a container or free standing or crated, is located is a "Ro-Ro" trailer for use on a "Ro-Ro" ship. The trailer itself is simply irrelevant to the question. Such a result comports with the Ninth Circuit concept, expressed in Hartford, supra, that the "plain, ordinary meaning" of "package" be utilized. Certainly, any test which makes goods carried on a "Ro-Ro" trailer a "package," merely because of the use of said trailer, would not coincide with a "plain, ordinary meaning" of the word.

PRMSA argues that the cases have relied upon the concept of preparation for transportation as the important indicia of a "package" and in accord with that concept have held that the attachment of freight to a wooden skid in order to facilitate handling and transportation is a sufficient act to constitute that freight a "package." PRMSA goes on to contend that a metal skid was attached to the transformer in question for the purpose of facilitating its transportation and that, in addition, the "Ro-Ro" trailer itself was a type of "rolling skid," also designed to facilitate transportation.

It is true that a number of cases, primarily in the Second Circuit, have adopted the "facilitate handling and transportation" test, see Aluminios Pozuelo Ltd. v. S. S.

10. Cf. Rosenbruch v. American Export Isbrandtsen Lines, Inc., 543 F.2d 967 (2d Cir. 1976), cert. den. 429 U.S. 939, 97 S.Ct. 353, 50 L.Ed.2d 308 (1976); Royal Typewriter Co. Div. Litton Bus. Sys. Inc. v. M/V Kulmerland, 483 F.2d 645 (2d Cir. 1973); Lucchese v. Malabe Shipping Co., Inc., 351 F.Supp. 588 (D.P.R. 1972); United Purveyors, Inc. v. Motor Vessel New Yorker, 250 F.Supp. 102 (S.D.Fla.1965).

11. Cf. Shinko Boeki Co., Ltd. v. S. S. "Pioneer Moon," 507 F.2d 342 (2d Cir. 1974); DuPont de Nemours International S. A. v. S. S. Mormacvega, 493 F.2d 97 (2d Cir. 1974); Leather's Best, Inc. v. S. S. Mormaclynx, 451 F.2d 800 (2d Cir. 1971). See also Wirth, Ltd. v. S/S Acadia Forest, 537 F.2d 1272 (5th Cir. 1976).

12. See Herd & Co. v. Krawill Machinery Corp., 359 U.S. 297, 79 S.Ct. 766, 3 L.Ed.2d 820 (1959) (implicit recognition that a fully crated, 19-ton press is a "package"); Reid v. Fargo, 241 U.S. 544, 36 S.Ct. 712, 60 L.Ed. 1156 (1916) (under a different statute, it was impliedly held that a fully boxed automobile was in a "package" for the purposes of a limitation on the carrier's liability); Mitsubishi International Corp. v. S. S. Palmetto State, 311 F.2d 382 (2d Cir. 1962), cert. den. 373 U.S. 922, 83 S.Ct. 1523, 10 L.Ed.2d 422 (1963) (3 fully boxed rolls of steel weighing 3½ tons each, held to be "packages"). See also cases cited in Aluminios Pozuelo Ltd. v. S. S. Navigator, 407 F.2d 152, 155 (2d Cir. 1968).

*Navigator*, 407 F.2d 152 (2d Cir. 1968); *Island Yachts, Inc. v. Federal Pacific Lakes Line*, 345 F.Supp. 889 (N.D.Ill.1971);[13] *Companhia Hidro Electrica v. S/S "Loide Honduras,"* 368 F.Supp. 289 (S.D.N.Y.1974); *Middle East Agency v. The John B. Waterman*, 86 F.Supp. 487 (S.D.N.Y.1949). I believe, however, with the Ninth Circuit, that to exalt the use of a skid or some other form, however minor, of preparation to facilitate transportation and handling to the status of a "package" is to exalt one element of packaging at the expense of ignoring other elements of at least equal importance and is to transform the concept of a "package" into something undreamed of by Congress in 1936 which intended, instead, that the word be given its "plain, ordinary meaning."

■ To reiterate, for me the elements of a COGSA package are:

(1) in the course of preparation for transportation or handling

(2) by the shipper or shipper's agent (or a predecessor of the shipper)

(3) the goods are partially or completely covered or contained by the time delivered or entrusted to the custody of the carrier

(4) in such a way as to preclude facile identification of the exact character of the goods contained therein or of their condition or quantity (including the condition of any outer covering of, or quantity of, smaller units of goods which have been grouped by the shipper into larger individuated units in the course of preparation for transportation or handling).

I believe such a listing of the elements comes closer to harmonizing the reconcilable cases and to comporting with the "plain, ordinary meaning" of the word "package" than any other statement to which my attention has been directed.

■ While in a given close case the description of the goods on a bill of lading might be relevant in determining whether they constitute one or more packages, the parties cannot, consistent with COGSA, by their private intentions or characterizations make something which is not a COGSA package into a COGSA package. *Omark Industries v. Associated Container, Etc., supra* at 143, note 18; *Matsushita Elec. Corp. v. S. S. Aegis Spirit, supra* at 905. Therefore, even if one were to conclude that the listing of the number "2" under the column on a short form bill of lading headed "No. of Pkgs." was some type of admission or agreement that the freight was a "package," PRMSA can not prevail on that ground alone.

■ PRMSA argues that the plaintiffs, whose agents apparently filled out the short form bill of lading, could have protected themselves by declaring a higher value of the goods in the place provided on the short form bill of lading, and that by failing to do so, they have forfeited any right to complain of the $500 limitation. The short answer to that argument is, of course, that the plaintiffs had no need to declare a higher value since the transformer was not a "package" and the liability limit, therefore, was the much larger one of $500 per cubic foot, the customary freight unit.

### III

■ The defendant, Leonard Bros. Trucking Co., did not contract to transport the transformers to Puerto Rico under a "Through Bill of Lading" within the meaning of the Carmack Amendment, 49 U.S.C. § 20(11). Therefore, Leonard Bros. Trucking Co. was not the "initial carrier" and is not liable for damage occurring while the transformers were in the custody of PRMSA.

### IV

Judgment will be entered for plaintiffs against PRMSA in the amount of agreed

---

13. In this case a yacht was declared to be a "package" because it was prepared for transportation in a way to facilitate handling by putting it in a shipping cradle. However, such a conclusion was not necessary to the decision in the case in view of the fact that the customary freight unit for which freight was charged was the yacht itself and, accordingly, the limitation of the carrier's liability was $500 in any event.

damages of $13,901.01 and interest at 6% from February 3, 1975, plus costs.